[Cite as *Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764.]

UTILITY SERVICE PARTNERS, INC., APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.
[Cite as *Util. Serv. Partners, Inc. v. Pub. Util. Comm.,*
**124 Ohio St.3d 284, 2009-Ohio-6764.]**
*Public Utilities Commission — Order requiring natural gas company to repair*
*service lines upheld.*
(No. 2008-1507 — Submitted September 2, 2009 — Decided
December 29, 2009.)
APPEAL from Public Utilities Commission of Ohio, No. 07-478-GA-UNC.

_____

**CUPP, J.**

**{¶ 1}** Utility Service Partners, Inc. ("USP") appeals from an order of the
Public Utilities Commission of Ohio making Columbia Gas of Ohio, Inc.
("Columbia") responsible for the repair and replacement of hazardous natural gas
service lines. USP alleges that the commission lacked statutory authority to issue
the order and that the order lacked record support, substantially impaired the
obligations of USP's contracts, and resulted in an unconstitutional taking of
property. None of USP's arguments has merit, and we affirm.

**I**

**{¶ 2}** A service line is part of the pipeline system used to distribute
natural gas. Running roughly from the curb to the meter, it is the last part of the
journey natural gas takes from the depths of the earth to the home of the
consumer. Unlike every other part of Columbia's distribution system, the service
line is generally owned by the customer.

**{¶ 3}** Before the order in this case, if a service line leaked — for
example, as a result of corrosion or because struck by the shovel of a backhoe —

the customer was responsible for the costs of repairing or replacing the line. If the leak was hazardous, gas service was terminated until the line was repaired, whether the customer could afford the repair or not.

{¶ 4} To help customers prepare for such an eventuality, USP offered customers what it called an "external gas line warranty." For a monthly fee, USP would assume responsibility to repair or replace the service line if something went wrong. At the time of the commission order at issue herein, roughly 100,000 of Columbia's 1.4 million customers had purchased warranties from USP.

{¶ 5} In April 2000, a serious event, termed an "incident" under federal law, occurred at a southwestern Ohio home. See Section 191.3(1)(i) and (ii), Title 49, C.F.R. (defining "incident" to include "[a]n event that involves a release of gas from a pipeline * * * and * * * [a] death, or personal injury necessitating in-patient hospitalization; or * * * property damage * * * of $50,000 or more"). The part of the service line that connects to the meter (called the "riser") failed and pulled away from the remainder of the line. Natural gas began blowing out of the disconnected line, apparently filling the basement. Something ignited, and the gas exploded. As a commission staff person testified in this case, "By the time the company got there, stopped the flow of gas and everything the house was severely damaged, actually ended up being totaled. As we were doing our investigation at the site, we had several homeowners come up to us and say, 'That same thing happened to my gas meter. The gas line pulled out and gas was blowing at the foundation of my house' * * *."

{¶ 6} That month, the commission initiated an investigation of the gas company in question. Over the next three years, while the investigation was underway, at least three more risers failed and caused explosions. In response, in 2005, the commission opened a statewide investigation and charged its staff, with the cooperation of natural gas companies, to report on the condition and performance of risers in Ohio.

{¶ 7}   The staff issued its report in November 2006.  A few weeks later, the chairman of the commission filed a letter in the investigation docket asking Ohio's distribution companies to consider "utilities taking over responsibility for the customer owned service lines" versus "the prudence" of "leav[ing] responsibility with the homeowner."

{¶ 8}   Apparently Columbia found taking over responsibility from the customer the prudent course, and in April 2007, it submitted an application seeking authority to "assum[e] responsibility for * * * the future maintenance, repair and replacement of customer-owned service lines." Numerous parties intervened, including two parties that opposed Columbia's assumption of service-line responsibility.  One was a plumbing company that stood to lose both warranty and repair business to Columbia. The other was USP, which asserted that Columbia's proposal to assume service-line responsibility "would eradicate the corresponding gas service line warranty component of [its] business."

{¶ 9}   In October 2007, the case went to hearing, and USP actively participated in the hearing.  On December 28, 2007, Columbia filed a stipulation signed by the company, staff, Ohio Consumers' Counsel, and a consumer group. The stipulation recommended that Columbia "be permitted to assume responsibility for * * * the future maintenance, repair and replacement of hazardous service lines." More hearings were held, this time concerning the stipulation.  USP again participated, and filed a posthearing brief urging the commission to reject the stipulation.

{¶ 10} Nevertheless, the commission approved it.  USP sought rehearing but was denied.  This appeal followed.

## II

{¶ 11} The sole issue on appeal is whether the commission reasonably and lawfully made Columbia responsible for the repair and replacement of hazardous service lines.  See R.C. 4903.13.  USP challenges the order on four grounds,

arguing (1) that the commission lacked statutory authority to make Columbia responsible for service lines, (2) that the order was not supported by evidence, (3) that the order was unconstitutional because it substantially impaired the obligations of contracts, and (4) that the order was unconstitutional because it resulted in a taking without just compensation. We find USP's arguments to lack merit, and we affirm the commission's order.

*A*

{¶ 12} USP argues that the commission lacked statutory authority to make Columbia responsible for the repair or replacement of hazardous service lines. This argument is without merit.

{¶ 13} In issuing the order, the commission relied on R.C. 4905.06. That section gives the commission general supervisory authority over utilities; among other things, it provides the commission with the "power to inspect" public utilities, which "includes the power to prescribe any rule or order that the commission finds necessary for protection of the public safety." The fact that only one string is attached to this power — the commission must find the rule or order necessary — implies a generous grant of discretion to issue safety-related orders. See *Akron v. Pub. Util. Comm.* (1948), 149 Ohio St. 347, 359, 37 O.O. 39, 78 N.E.2d 890 (recognizing the commission's "broad" authority under various statutes "to protect and safeguard the interests of the public, particularly in respect to health, safety and welfare"). Thus, if the order was related to the "protection of the public safety," the commission acted within its powers.

{¶ 14} We find that the order was related to the protection of the public safety. The commission expressly acted "to improve the level of public safety," and the terms of its order were rationally related to that end. Service lines carry natural gas, and natural gas is dangerous unless it is handled properly. It is noxious, flammable, invisible, and naturally odorless. Natural gas is potentially lethal to persons and destructive of property. We have long recognized its

dangers. See, e.g., *Suiter v. Ohio Valley Gas Co.* (1967), 10 Ohio St.2d 77, 78, 39 O.O.2d 65, 225 N.E.2d 792 ("It is a matter of common knowledge that * * * gas is a * * * dangerous commodity with a marked tendency to escape from its proper confines"); *Northwestern Ohio Natural Gas Co. v. First Congregational Church of Toledo* (1933), 126 Ohio St. 140, 184 N.E. 512, paragraph four of the syllabus (recognizing "the highly dangerous character of gas and its tendency to escape").

{¶ 15} Thus, the order, in seeking to improve the regulation of pipelines that prevent the escape of a dangerous substance, had a clear tie to public safety. And the order gave Columbia responsibility only over "hazardous" service lines, eliminating any argument that the commission exceeded the bounds of the safety power. We conclude that the commission acted with statutory authority.

{¶ 16} On this point, USP's objections boil down to two issues: first, that the commission lacked the power to regulate "previously * * * non-jurisdictional property" and, second, that the commission "affect[ed] the contract rights and property of third parties over whom it has no jurisdiction."

{¶ 17} It is true that service lines used to be nonjurisdictional in the sense that Columbia's customers used to be responsible for arranging and paying for service-line repair. But this does not mean that the commission exceeded the bounds of its jurisdiction. The commission merely regulated in a new way a person (Columbia) and a kind of property (segments of the distribution system) already subject to its jurisdiction. See R.C. 4905.03(A)(6), 4905.04, 4905.06, and 4929.03.

{¶ 18} Modifying a regulatory scheme is not problematic in itself. Agencies undoubtedly may change course, provided that the new regulatory course is permissible. See, e.g., *Luntz Corp. v. Pub. Util. Comm.* (1997), 79 Ohio St.3d 509, 512–513, 684 N.E.2d 43 ("the commission must, when appropriate, be willing to change its policies"); see also *Fed. Communications Comm. v. Fox Television Stations, Inc.* (2009), ___ U.S. ___, ___, 129 S.Ct. 1800, 1811, 173

L.Ed.2d 738 (an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates" [emphasis sic]). The issue, then, is whether the commission's new course is permissible under the statute. We find that it is.

{¶ 19} Four catastrophic home explosions provided the commission with striking evidence of what can happen when service lines fail. It investigated the matter, identified a possible safety gap (which was confirmed during the hearings in this case), and acted to close that gap and head off any further incident. The result of this regulatory deliberation and fact-finding, at issue here, is permissible under R.C. 4905.06.

{¶ 20} USP's other argument—that commission orders simply may not "affect" unregulated parties—fares no better. USP cites no authority in support of this hopelessly overbroad proposition. If the commission could not issue orders that "affect" unregulated parties, it could not function. It would be a rare order that did not affect unregulated persons: an order increasing rates, for instance, has the "effect" of transferring additional money from unregulated persons to regulated companies; likewise, an order denying a proposed construction project "affects" unregulated suppliers of labor and materials. The mere fact that an order affects unregulated parties is not problematic—it is inevitable. USP must show that the commission lacked authority to do what it did, and that inquiry is governed by the Revised Code, not the mere presence or absence of effects on third parties.[1]

*B*

---

1. We do not suggest that an order's effect on an unregulated person can never be relevant to the lawfulness or reasonableness of a given order; that question is not before us. We hold only that the mere fact that an unregulated person might be affected by an order does not deprive the commission of power to issue it.

{¶ 21} In its second proposition of law, USP asserts that the commission lacked support in the record for two determinations it made: (1) that there was a safety problem with service lines that do not have the kind of riser whose failure prompted the commission's initial investigation and (2) that Columbia should be responsible for the repair and replacement of service lines. We find both determinations, however, amply supported in the record.

1.

{¶ 22} Service lines can pose safety hazards. They carry a dangerous substance that has a tendency to escape. The undisputed evidence shows that a series of explosions resulting from service-line failures damaged or destroyed homes from 2000 to 2003. If the explosive destruction of multiple homes does not establish a safety issue, it is unclear what would.

{¶ 23} USP concedes that there was evidence of safety issues associated with risers (the above-ground portion of the service line), but it asserts that there was no evidence of safety issues with any other part of the service line. The record, however, shows that the riser *is* part of the service line, and USP cites no authority limiting the commission's safety jurisdiction to the narrowest segment manifesting safety issues on a particular line. But even if we accept USP's conceptual division of the service line, the record contains substantial evidence that service lines in general—not simply a particular type of failed riser—also posed safety issues.

{¶ 24} Indeed, numerous witnesses for both sides agreed that service lines in general can create safety issues. For example, Michael Ramsey (a Columbia manager charged with ensuring compliance with pipeline safety regulations) explained that "leaks in steel service lines" can "present hazards to life and property." In addition to leaks caused by damage from digging, steel service lines leak when they corrode, and Ramsey testified that "a leaking customer service line," if not fixed, could "present a danger" to both owner and neighbors because

"gas can migrate and could migrate to [the neighbor's] house." If the "gas migrates into the structure, and if there is a source of ignition, it can cause * * * catastrophic damage to the structure."

{¶ 25} Witnesses sponsored by USP confirmed the point. For example, USP witness Carter Funk recognized that corrosion causes leaks on underground service lines and acknowledged on cross-examination that "[c]orrosion and bare steel service lines can present a safety hazard." USP witness Timothy Phipps also recognized that corrosion causes leaks on underground service lines, and he also agreed on cross-examination that "one of the reasons for repairing gas leaks on gas lines is * * * safety." He knew this because he had "seen the aftermath of more than one" "fire at a house from a gas line," which also "create[d] a danger to other residences in the immediate vicinity."

{¶ 26} The record thus supports the commission's determination that service lines, wherever they run, present safety issues.

2.

{¶ 27} Likewise, the record supported the commission's decision to place service-line responsibility in the hands of a single regulated company. Evidence showed that the incomplete, decentralized, and unregulated system for repairing service lines then in existence had significant flaws.

{¶ 28} Testimony showed that there were major gaps in service-line warranty coverage. Roughly 93 percent of Columbia's 1.4 million customers did not hold service-line warranties with USP. The commission reasonably accorded significance to this fact.

{¶ 29} If a customer without a warranty smelled natural gas outside his home, he might choose not to report it—especially if he was in financial straits. Reporting a leak would bring a utility truck to the home and perhaps a dilemma to the customer: either arrange for an expensive repair or suffer an indefinite termination of gas service. If a customer did not report the leak, it could delay the

time in which it would be detected by Columbia, which under federal law must inspect lines outside business districts only every three to five years. See Section 192.723, Title 49, C.F.R. Given that natural gas leaks are dangerous, it stands to reason that a system containing natural disincentives to report leaks is a hindrance to safety.

{¶ 30} And even if customers could afford repair, the evidence showed that there were issues in the industry actually doing the repairs. Before the order, if a repair was needed, either the homeowner or warranty company would locate and hire a private contractor to fix the line. A number of witnesses for both the commission and Columbia highlighted flaws with this decentralized, unsupervised system, but it is sufficient here to consider what USP's own witness had to say.

{¶ 31} Timothy Phipps, owner and operator of a company that did repair work for USP, explained on cross-examination that "the sort of thing you see that contractors do [is] that they can be taking shortcuts," which he equated with "doing a shoddy job." He also explained that it was hard to determine which contractors were doing "a shoddy job"; as he put it, there are "some bad eggs out there[,] but who knows where they are at. I couldn't say." When asked what percentage of contractors took shortcuts, Phipps answered, "I would say probably 20, 30 percent," and "possibly" a third.

{¶ 32} To be fair, Phipps qualified his testimony by stating that "it's immaterial whether [private contractors] took a shortcut * * * because the gas company checks everything that they do," that Columbia's inspectors "are very thorough about their checks," and that "[Columbia's] people are trained." Perhaps it is true that Columbia's employees would catch shortcuts; but if so, we find this fact at least as favorable to the commission as to USP.

{¶ 33} In short, the record supports the commission's decision to make Columbia responsible for the repair and replacement of hazardous service lines.

3.

**{¶ 34}** USP cannot establish that the order is not supported by evidence. What USP establishes, at best, either is irrelevant or does not justify reversal. It points out other types of evidence that could have been presented but were not. For example, it states, "The Staff Report [in the case investigating risers statewide] makes no reference whatsoever to any safety issues associated with metal customer-owned service lines." But why a report from a different case should have addressed the case below is left unexplained. USP also asserts that "neither Columbia nor the Staff presented any evidence regarding clamor from the public over the safety of customer-owned service lines." But it should go without saying that no regulatory authority conditions jurisdiction on public clamor. USP also repeatedly points out that risers are more dangerous than underground service lines. But, not surprisingly, no authority limits the commission's safety authority to the most unsafe pipeline—or segment of that pipeline.

**{¶ 35}** Evidence before the commission pointed both ways, and mostly in favor of the commission. USP, in essence, asks us to reweigh the evidence. But that is outside the scope of our function on appeal. *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 39.

*C*

**{¶ 36}** In its third proposition of law, USP argues that the commission violated the state and federal constitutional prohibition against the impairment of the obligation of contracts. Section 10, Article I, United States Constitution; Section 28, Article II, Ohio Constitution. It states that the commission "nullified at least 100,000 of USP's warranty service contracts" and "destroy[ed] USP's contractual relationship with its customers." Despite USP's assertions, we do not find that the commission violated the Contract Clause.

**{¶ 37}** In determining whether the obligations of USP's then-existing contracts were unconstitutionally impaired, the parties agree that *Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983), 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569, applies. That case instructs us to ask " 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' " Id. at 411, quoting *Allied Structural Steel Co. v. Spannaus* (1978), 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727. If so, then we determine whether the government has "a significant and legitimate public purpose behind the regulation." Id. at 411. And if that is the case, we inquire "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " (Brackets sic.) Id. at 412, quoting *United States Trust Co. of New York v. New Jersey* (1977), 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92. In applying the *Energy Reserves* test, we conclude that the commission order is valid under the Contract Clause.

1.

**{¶ 38}** The first inquiry we make is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.*, 438 U.S. at 244. USP has not created a record sufficient to allow this court to make that determination.

**{¶ 39}** No contract or detailed description of the terms of any contract has been included in the record. Thus, USP's assertions that its contracts were "nullified" are merely unsupported legal conclusions. Without evidence of the "obligation of contracts," it is impossible to determine whether they have been "impaired." Cf., e.g., *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987), 480 U.S. 470, 504, 107 S.Ct. 1232, 94 L.Ed.2d 472 ("In assessing the validity of petitioners' Contracts Clause claim in this case, we begin by identifying *the precise contractual right* that has been impaired * * *" [emphasis added]). USP

thus has failed to create a record sufficient for us to decide whether any obligation of its contracts has been impaired.

{¶ 40} We may not speculate regarding USP's contractual obligations. Thus, the lack of this essential evidence is fatal to USP's impairment-of-contracts claim. See *Hughes v. Wendel* (1942), 317 U.S. 134, 63 S.Ct. 103, 87 L.Ed. 139 ("Appellant contends that this statute * * * impairs the obligation of her contract contrary to Article I, § 10 of the Constitution. The record, however, does not set forth appellant's lease, and the incomplete summary of it contained in her pleading is not adequate to enable us to determine what her rights may be. Accordingly, we must dismiss the appeal"); see also *Chicago, Burlington & Quincy RR. Co. v. Cram* (1913), 228 U.S. 70, 85, 33 S.Ct. 437, 57 L.Ed. 734 ("The contention is made that the statute impairs the obligation of the contracts * * *; but that contention was not made in the court below and cannot therefore be made here. Besides, there is no evidence of the contracts in the record").

2.

{¶ 41} Even if we assume, however, that USP demonstrated that the obligations of its existing contracts have been substantially impaired by the commission order, the impairing regulation in this case is justified by "a significant and legitimate public purpose." *Energy Reserves*, 459 U.S. at 411–412, 103 S.Ct. 697, 74 L.Ed.2d 569.

{¶ 42} As *Energy Reserves* made clear, the Contract Clause's prohibition "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' " Id. at 410, quoting *Home Bldg. & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413. In that case, the court held that the state was prompted by "significant and legitimate state interests" in "exercis[ing] its police power to protect consumers from the escalation of natural gas prices caused by deregulation." Id. at 416–417; see also, e.g., *Keystone Bituminous Coal Assn.*, 480 U.S. at 503, 107 S.Ct. 1232, 94

12

L.Ed.2d 472, quoting *Manigault v. Springs* (1905), 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (" '[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States' "). While it is true that "private contracts are not subject to unlimited modification under the police power," state regulation need only "serve a legitimate public purpose" and "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *United States Trust Co.,* 431 U.S. at 22–23, 97 S.Ct. 1505, 52 L.Ed.2d 92 (state action violated the Contract Clause in a case in which a state was a party to the contract).

**{¶ 43}** This point of law is amplified by numerous cases in which we have affirmed the commission's police-power orders against Contract Clause challenges. These cases make clear that " '[t]he provisions of the state and federal constitutions, inhibiting laws impairing the obligation of contract, do not affect the power of the state to protect the public health or the public safety.' " *Columbia Gas of Ohio, Inc. v. Pub. Util. Comm.* (1983), 5 Ohio St.3d 105, 109, 5 OBR 241, 449 N.E.2d 433, quoting *Akron,* 149 Ohio St. 347, 37 O.O. 39, 78 N.E.2d 890, paragraph four of the syllabus; see also, e.g., *Atwood Resources, Inc. v. Pub. Util. Comm.* (1989), 43 Ohio St.3d 96, 100, 538 N.E.2d 1049 ("because the provisions of the state and federal Constitutions, prohibiting laws impairing the obligation of contracts, do not affect the police power, Atwood's 'private endeavors' are subject to regulation"); *Ohio Edison Co. v. Power Siting Comm.* (1978), 56 Ohio St.2d 212, 217, 10 O.O.3d 371, 383 N.E.2d 588; *Akron*, 149 Ohio St. at 359; cf. *Steele, Hopkins & Meredith Co. v. Miller* (1915), 92 Ohio St. 115, 125, 110 N.E. 648.

**{¶ 44}** Here, the commission's order represented an exercise of police power. At a minimum, the police power includes actions taken to protect public safety. See *Ohio Edison Co.*, 56 Ohio St.2d at 217, 10 O.O.3d 371, 383 N.E.2d 588 (defining "police power legislation" as that "designed to protect public health,

safety and welfare"); *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 47, 616 N.E.2d 163 ("Legislative concern for public safety is not only a proper police power objective—it is a mandate"). The commission expressly stated that its order was "an effort to improve the level of public safety," and the commission reasonably and with ample support in its record determined that making Columbia responsible for service lines would protect the public safety. Thus, even if the obligations of USP's contracts were impaired, the order was driven by a significant and legitimate public purpose and satisfies the second part of the *Energy Reserves* test.

3.

{¶ 45} If USP had shown substantial impairment (which it did not), then only the third inquiry would remain: whether the regulation is based " 'upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Energy Reserves*, 459 U.S. at 412, 103 S.Ct. 697, 74 L.Ed.2d 569, quoting *United States Trust Co. of New York*, 431 U.S. at 22, 97 S.Ct. 1505, 52 L.Ed.2d 92. We have held that we will not invalidate an exercise of the police power "unless the * * * determination that the [regulation] bears a real and substantial relationship to public health, safety and welfare appears to be clearly erroneous." *Ohio Edison*, 56 Ohio St.2d at 218, 10 O.O.3d 371, 383 N.E.2d 588.

{¶ 46} Here, the evidence showed that the decentralized, unregulated, and incomplete repair regime that had grown up in Ohio did not adequately protect public safety. The order rationally responded to this situation by consolidating a diffuse system and placing repair responsibility into the hands of the party the commission determined to be the best qualified to exercise it: a pervasively regulated, thoroughly supervised, pipeline-expert natural gas company. That the order was well tailored to meet its objective is evidenced by the fact that Columbia was authorized to take control only over hazardous lines and would

own only those portions of the line that it has actually repaired or replaced.  For these reasons, the third part of the *Energy Reserves* test is satisfied.

{¶ 47} Finding that USP satisfies none of inquiries set forth in *Energy Reserves*, we must reject its Contract Clause challenge.

*D*

{¶ 48} In its fourth proposition of law, USP argues that the order resulted in a "taking of private property without just compensation."  USP does not argue that its property has been taken, but that the commission "took property rights from the homeowner." USP, however, lacks standing to raise the constitutional rights of property owners, so we do not reach the merits of the takings claim.

{¶ 49} "A party must have standing to be entitled to have a court decide the merits of a dispute."  *N. Canton v. Canton*, 114 Ohio St.3d 253, 2007-Ohio-4005, 871 N.E.2d 586, ¶ 11.  To have standing, the general rule is that "a litigant must assert its own rights, not the claims of third parties."  Id. at ¶ 14.  There may be, however, "circumstances where it is necessary to grant a third party standing to assert the rights of another."  *Kowalski v. Tesmer* (2004), 543 U.S. 125, 129–130, 125 S.Ct. 564, 160 L.Ed.2d 519.   Third-party standing is "not looked favorably upon," id. at 130, but it may be granted "when a claimant (i) suffers its own injury in fact, (ii) possesses a sufficiently ' "close" relationship with the person who possesses the right,' and (iii) shows some 'hindrance' that stands in the way of the claimant seeking relief."  *E. Liverpool v. Columbiana Cty. Budget Comm.,* 114 Ohio St.3d 133, 2007-Ohio-3759, 870 N.E.2d 705, ¶ 22, quoting *Kowalski* at 130.

{¶ 50} USP has no right to assert this claim on behalf of property owners.  Assuming that USP has suffered "its own injury in fact" under the first factor, it fails to establish the second or the third factors: USP's interests appear opposed to those of property owners, and it has shown no hindrance in the way of property owners who might desire to seek relief on their own.

{¶ 51} Regarding the second factor, close relationship with the person who possesses the right, nothing knits USP and property owners together besides "the underlying contract between them," which we have previously held does not justify third-party standing. *N. Canton* at ¶ 16. The interests of USP and property owners are neither "interdependent," see id., nor "common," see *Powers v. Ohio* (1991), 499 U.S. 400, 413, 111 S.Ct. 1364, 113 L.Ed.2d 411. If anything, their interests appear opposed: The Office of the Ohio Consumers' Counsel—which represents residential consumers, and thus residential property owners, in utility matters—*supported* the stipulation that USP now attacks. And it appears from the record that Columbia will be able to provide customers the same service as USP for a fraction of the cost per customer. Therefore, USP may not assert these owners' rights. See, e.g., *Singleton v. Wulff* (1976), 428 U.S. 106, 113–114, 96 S.Ct. 2868, 49 L.Ed.2d 826 ("courts must hesitate before resolving a controversy * * * on the basis of the rights of third persons not parties to the litigation * * * [because] it may be that in fact the holders of those rights * * * do not wish to assert them").

{¶ 52} Nor does USP satisfy the final third-party-standing factor; there is no hindrance in the way of property owners who might desire to seek relief. *N. Canton,* 114 Ohio St.3d 253, 2007-Ohio-4005, 871 N.E.2d 586, at ¶ 14. In *N. Canton*, we observed that the plaintiff city "failed to demonstrate that [the third party] was hindered from asserting its own rights in this matter." Id. at ¶ 17. The third party "did not choose to file suit, nor has it even attempted to intervene in this case," and "nothing * * * prohibit[ed] [the third party] from asserting its own claim." Id. Here, likewise, USP has not shown that any barrier would hinder a property owner from asserting his or her own takings claim.

{¶ 53} Even if USP had standing to raise this claim, we find that USP failed to support its takings argument, thus effectively waiving that argument. In the argument in its initial brief, USP cites only a decision of this court from 1902

16

involving riparian and sewage rights. In light of many developments in takings law since that case was decided (both in Ohio and at the federal level), it is not clear to us that this case controls the outcome here. No argument is supplied regarding whether the relevant case law, applied to the facts of this case, justifies a decision in USP's favor. USP bears the burden of demonstrating the unlawfulness of the commission's order, and thus we hold that USP, even if it had standing, failed to support its takings claim.

{¶ 54} USP's argument that the commission "effected a taking of *contract rights* without just compensation" was raised for the first time on reply, and USP has thus failed to preserve it. See *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 61.

### III

{¶ 55} For the foregoing reasons, we affirm the order of the commission.

Order affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and LANZINGER, JJ., concur.

_____

Vorys, Sater, Seymour & Pease, L.L.P., M. Howard Petricoff, Stephen M. Howard, and Michael J. Settineri, for appellant.

Richard Cordray, Attorney General, Sheryl Creed Maxfield, First Assistant Attorney General, Duane W. Luckey, Section Chief, and Anne L. Hammerstein and Sarah J. Parrot, Assistant Attorneys General, for appellee.

Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, L. Bradfield Hughes, and Eric B. Gallon; and Mark R. Kempic, Kenneth W. Christman, Stephen B. Seiple, and Daniel A. Creekmur, for intervening appellee Columbia Gas of Ohio, Inc.

_____