[Cite as *McCarthy v. Charter One Bank, F.S.B.*, 2012-Ohio-4030.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| COUNTY OF SUMMIT | )ss:<br>) | NINTH JUDICIAL DISTRICT |

MELINDA J. MCCARTHY

    Appellees/Cross-Appellants

    v.

CHARTER ONE BANK, F.S.B.

    Appellees

and

SANDRA HARAMIS, et al.

    Appellants

and

THE HOMEOWNER'S ASSOCIATION
OF TWEED LAKES, INC.

    Appellees/Cross-Appellants

C.A. No.     25894
25909
25912

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2005 02 1260

DECISION AND JOURNAL ENTRY

Dated: September 5, 2012

MOORE, Presiding Judge.

**{¶1}** Appellants, who are certain property owners in a development known as Tweed Lakes, appeal several interlocutory orders of the trial court that were issued before the claims in this case were resolved by dismissal in connection with a settlement agreement. The Homeowners Association of Tweed Lakes and the plaintiffs, another group of property owners in the Tweed Lakes development, have cross-appealed. With respect to the appellants, this Court

affirms the decisions of the trial court. Having reached that conclusion, the cross-assignments of error need not be addressed.

I.

{¶2} The Tweed Lakes Development was originally conceived by John Clapper Homes as a residential development involving a lake supported by a dam. As the individual lots were sold, the deeds contained restrictions providing for maintenance of the dam and the common areas within the development. The restrictions also required that once 75% of the lots had been sold, ownership of the common areas and the dam would pass to a homeowners association, which would then be responsible for their maintenance and upkeep. When the developer encountered financial difficulties, its lender foreclosed on the properties within the development and took title to the property, including the dam and the common areas. The lender continued to sell the individual parcels for development with the deed restrictions and, when the 75% threshold was reached, incorporated two homeowners associations. Although the homeowners associations were legally incorporated, it seems that the property owners did not know that they had been formed by the lender. Consequently, some property owners met together informally in 2001 and ultimately incorporated another homeowners association, the Homeowners Association of Tweed Lakes, Inc. ("the Association"). Soon, the Association began to collect dues and assessments from property owners. Some paid, while others did not. According to the bylaws, those members who were in arrears with respect to dues and assessments could not vote on matters affecting the Association.

{¶3} Meanwhile, it became apparent that the dam supporting Tweed Lake was structurally deficient. In 2004, the dam failed and collapsed, and the water from Tweed Lake drained onto properties within the development, leaving the lake empty. Lakefront properties

bore the brunt of the dam failure; other properties in the development were apparently not affected at all. At that time, disagreements arose among the property owners about how to proceed. It appears that from that point on, the property owners fell into three groups: (1) those who were actively involved in the Association (the "Minority Property Owners," the appellants herein), (2) those who were not actively involved and, it seems, who advocated a different course of action regarding the dam (the "Majority Property Owners," appellees herein), and (3) those who were not specifically aligned with either faction.

{¶4} In 2005, the Majority Property Owners filed the lawsuit underlying this appeal. They sued the original developer and the lender for damages in connection with the maintenance and transfer of the dam which, according to their allegations, was already in poor condition early in the development process. They also sued each of the homeowners associations formed by the lender and the trustees of those associations. Finally, they sued the Association and its past and present officers, seeking declaratory judgments regarding the validity of the Association, the constitution of its members, the members' responsibility to pay dues and assessments, and the Association's duty to repair the dam. Some defendants filed cross-claims and counterclaims, which were resolved during the course of the litigation. These included counterclaims against the plaintiffs for failure to pay dues and assessments.

{¶5} Early in the litigation, the rest of the property owners in Tweed Lakes – those who were not parties to the case by virtue of being plaintiffs or by holding a past or present office in the Association – were joined as defendants in recognition of the fact that the outcome of the litigation would affect their property rights. As a result, all forty-four property owners in the Tweed Lakes development became parties to this case: sixteen were plaintiffs, eight were current

or former officers of the association and were named as individual defendants, and the rest were joined as defendants.[1]

{¶6} Two decisions made by the trial court in 2006 and 2007 shaped the course of the litigation from that point forward. The first involved a motion for partial summary judgment filed by the Association and the Minority Property Owners with respect to count three of the amended complaint, which challenged the validity of the deed restrictions attached to each parcel. On November 20, 2006, the trial court granted the motion for partial summary judgment, concluding that the deed restrictions were valid and enforceable notwithstanding "the changed conditions of the neighborhood[.]" The trial court also concluded that "as each person of Tweed Lake acquired title to property, he/she became obligated to participate in [a] homeowners association[.]"

{¶7} The second critical decision resulted from bifurcation of the matter into two phases of litigation in September 2007 and the subsequent resolution of phase one. In the first phase, the trial court agreed to decide the threshold matter of whether the Association was valid and to adjudicate claims involving past and present officers of the Association. As part of phase one, the trial court considered a definitive issue in this case: whether, pursuant to the Association's bylaws, voting rights were limited to members who were current in paying dues and assessments. The trial court reasoned that once a decision was reached on those matters, the status of the respective Tweed Lakes parties would be clear and the second phase of the case could proceed against the lender with respect to liability for the failed dam.

{¶8} On October 11, 2007, the trial court ruled in phase one of the case. Because that order is the subject of this appeal, and because it influenced everything that happened from that

---

[1] There are 53 lots in Tweed Lakes owned by 44 property owners.

point forward, careful attention to the trial court's ruling is necessary. The trial court determined that the Association had been formed in compliance with R.C. Chapter 1702 and, consistent with its 2006 ruling, concluded that "[o]nce a valid corporation [was] formed, * * * the deed restriction requires mandatory membership of each property owner in the non-profit organization." The trial court went on to note, however, that the evidence did not establish technical compliance with R.C. Chapter 1702 regarding notice and meetings. Consequently, the trial court concluded that there was no evidence that the Association's bylaws had been validly adopted:

> Regarding the initial adoption of bylaws, the Court finds that the Defendant Association failed to present evidence of the following: when the bylaws were adopted; who was invited to attend the meeting adopting the bylaws; and who voted to adopt the bylaws. As such, the Court finds that notice was not given to all property owners which would have given them an opportunity to participate in the adoption of the proposed bylaws * * *. Therefore, although the proposed bylaws were guidelines for the Association, they do not govern all property owners located within the Tweed Lakes Development that were not given an opportunity to participate in their adoption.

The trial court then considered the validity of "amendments" to the bylaws in 2001, noting that the notice of meeting that had been sent at the time specifically excluded some property owners from participation. With respect to the "amendment," the trial court concluded that other than the original bylaws, there was "no proper evidence * * * which would indicate that owners were to pay dues prior to receiving voting and/or decision-making rights in the Association." In other words, the trial court concluded that without the bylaws, there was no limitation on members' right to vote. The Court noted that if bylaws were validly adopted in the future, all property owners would be subject to requirements for paying dues and assessments that those bylaws might contain. Because the deed restrictions required all property owners to participate in the homeowners association and the only limitation on voting participation was contained in the

invalid bylaws, the impact of the trial court's decision was that all property owners were voting members of the Association.

{¶9} Having determined that the Association was validly formed and having identified the Association's voting members, the trial court then permitted the Association to join with the plaintiff-property owners in their claims against the lender and the original association trustees. The Majority Property Owners voluntarily dismissed their claims soon after the trial court's ruling, and the trial court recognized that the dismissal meant that "the Association remain[ed] as the only party plaintiff." Thereafter, while the litigation progressed, problems persisted within the Association itself. According to filings in the trial court, the existing officers conducted a meeting for the purpose of adopting bylaws, but a majority of the property owners did not approve the proposal. The Majority Property Owners soon notified the trial court that a second meeting had been conducted on March 1, 2008, with a quorum in attendance, that a new set of bylaws had been adopted with 27 votes in support, constituting a majority of the possible 44 votes, and that a new board of directors had been elected. They also informed the trial court that the newly-constituted Association had reached a settlement with the lender. As a result, two groups of people claimed to speak on behalf of the Association: the original directors and those who were elected as a result of the March 1, 2008, meeting. Both groups claimed the authority to act on the Association's behalf with respect to settlement, and both claimed the authority to retain counsel to represent the Association.

{¶10} On April 24, 2008, the trial court determined that control of the Association had to be determined before the litigation could proceed. Recognizing that each of the attorneys who claimed to represent the Association also represented individual property owners, the trial court noted that one or the other would have a conflict in representing the Association depending on

which group was determined to be the rightful officers. Consequently, on that date, the trial court disqualified both attorneys who had entered an appearance on the Association's behalf from appearing in the action until control of the Association had been determined. Although a third meeting of the Association was held in August 2008, the results were the same as the March 2008 meeting, and this remained the status quo for two years. During that time, the Minority Property Owners attempted two intervening appeals, which this Court dismissed for lack of a final appealable order, and one appeal to the Ohio Supreme Court. The trial court finally decided the issue of control of the Association on April 1, 2010. At that time, the trial court recognized the officers elected at the August 2008 meeting as the rightful representatives of the Association and ordered the Association to retain counsel so that the litigation could proceed.

{¶11} While phase one of the case proceeded in the trial court, the lender engaged in settlement negotiations with the Association. According to the lender, an agreement in principal was reached as early as 2006. The record reflects further attempts to settle the case through 2008, but it seems that issues regarding control of the Association prevented finalization of the settlement. Consequently, in 2008, the lender filed a separate action against the Association alleging breach of contract and requesting a declaration of the parties' rights under the purported settlement agreement. That case was consolidated with the underlying litigation and, once the trial court determined who rightfully controlled the Association, progress toward a settlement resumed. The officers who had been recognized by the trial court and the voting membership approved the settlement. On March 24, 2011, all claims remaining against all parties were dismissed without prejudice.

**{¶12}** The Minority Property Owners, who opposed the settlement, appealed from the March 24, 2011, order dismissing the remaining claims. The basis for their appeal from that order is articulated well by a representation to the trial court in a filing on March 10, 2011:

> If the [Minority Property Owners] are correct in that the Association was legally entitled to suspend the voting rights of those homeowners who failed to pay dues and assessments prior to October 11, 2007, then the current board was not validly elected and there is no settlement. On the other hand, if the [Minority Property Owners] are incorrect, and the Court of Appeals upholds the Court's October 11, 2007 Order, then [the Association] is entitled to the proceeds of the alleged settlement pursuant to that Order. In either event, the Court of Appeals wi[ll] have to rule on the validity of the Court's October 11, 2007 Order before competing claims to the proceeds of any settlement can be distributed.

The Majority Property Owners and the Association also filed notices of appeal under App.R. 3(C)(1).

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN GRANTING [THE MAJORITY PROPERTY OWNERS] VOTING RIGHTS.

**{¶13}** The Minority Property Owners' first assignment of error is that the trial court erred in its October 11, 2007, order by determining that because the bylaws were not validly adopted, there was no limitation placed on property owners' voting rights in the Association by virtue of failure to pay dues and assessments. The Minority Property Owners "take no issue with" the trial court's factual determinations. Instead, their position is that regardless of the fact that the Association did not have validly adopted bylaws prior to 2008, the trial court erred by concluding that property owners who had not paid their dues and assessments should be allowed to vote on matters affecting the Association.

**{¶14}** The trial court found that the deed restrictions require every property owner in Tweed Lakes to participate in the homeowners association that was ultimately formed. The deed

restrictions, however, are silent on whether the homeowners association would collect dues and assessments, and they do not contain any limitations on the voting rights of members. In fact, the deed restrictions do not address voting at all. In this context, and mindful of the fact that the Minority Property Owners have not challenged the trial court's factual determinations, the question becomes whether, as a matter of law, members of a homeowners association must pay dues and assessments in order to vote when there are no such restrictions imposed by deed restrictions or documents that govern the association. The Minority Property Owners maintain that this is a settled issue in Ohio. We disagree.

{¶15} The Association is organized as a nonprofit corporation and, therefore, the provisions of R.C. Chapter 1702 regarding membership and voting apply. Under R.C. 1702.13, for example, "[u]nless otherwise provided in the articles or regulations of a corporation, all members have the same membership rights and privileges." R.C. 1702.20(A) also explains that "[e]xcept as otherwise provided in the articles or the regulations, each member, regardless of class, shall be entitled to one vote on each matter properly submitted to the members for their vote, consent, waiver, release, or other action." Under these statutes, a nonprofit corporation may provide through its articles of incorporation or bylaws that membership is connected to payment of dues or that only those members who pay dues may vote, but unless it does so, the provisions of R.C. 1702.13 and R.C. 1702.20(A) control. *See American Hungarian Fedn. v. Nadas*, 35 Ohio App.3d 72, 74-75 (8th Dist.1987) (giving effect to corporate documents that limited membership to those who paid membership fees).

{¶16} In this case, the trial court found that the deed restrictions contemplate mandatory participation in the homeowners association that would ultimately be formed. The deed restrictions do not limit participation in the Association based on payment of dues and

assessments, nor do they provide specifically for dues and assessments in the first place. The trial court found that the Association, although properly incorporated, did not properly adopt bylaws at any point before 2008, and the Minority Property Owners have not challenged this conclusion. Because apart from the invalid bylaws, there is no limitation on voting membership, all members in the Association have voting rights under R.C. 1702.13 and R.C. 1702.20(A).

{¶17} The Minority Property Owners seem to argue that a different outcome is necessary because this case involves a homeowners association. There are few cases that address the relationship between property ownership, membership in a homeowners association, and payment of dues and assessments, and there are no cases squarely on point with this one. Nonetheless, the cases that are related illustrate that the issue of primary importance in analyzing these cases is the construction of the relevant deed restrictions and bylaws of the homeowners association at issue. These cases are by their very nature fact specific, and they are consistent with application of R.C. Chapter 1720 to this case. *See e.g. Turner v. Burgundy Bay Assn.*, 6th Dist. No. OT-08-010, 2008-Ohio-3846 (bylaws of homeowners association provided for annual dues, which were the basis for membership in the association, and property owners' use of dock space was contingent on payment of fees, as provided in the bylaws and the dock license certificate); *Rome Rock Assn., Inc. v. Warsing*, 11th Dist. No. 98-A-0051, 1999 WL 1313618 (Dec. 17, 1999) (bylaws provided that active membership in the association was only available to property owners who paid dues and assessments that were spelled out in the bylaws and deed restrictions); *Johnson's Island Property Owners' Assn. v. Nachman*, 6th Dist. No. OT-98-043, 1999 WL 1048235 (Nov. 19, 1999) (membership in homeowners association extended to property owners who paid dues and assessments, as set forth in the bylaws and, because the deed restrictions and corporate regulations were silent, property owners were not compelled to

participate in the association); *Holiday Lakes Property Owner's Assn., Inc. v. McCune*, 6th Dist. No. H-89-59, 1991 WL 1576 (Jan. 11, 1991) (deed restrictions and bylaws provided for compulsory membership in and payment of annual dues to homeowners association); *Patryak v. Cinnamon Lake Assn.., Inc.*, 5th Dist. No. CA-875, 1987 WL 14063 (June 25, 1987) (homeowners association could not levy dues in excess of the maximum assessment permitted by the deed restrictions and association bylaws).

{¶18}  The Minority Property Owners point to *Johnson's Island Property Owners' Assn. v. Nachman*, 6th Dist. No. OT-98-043, in support of their position, arguing that in that case, "the Court of Appeals upheld a lower court's ruling for the Association stating that, notwithstanding the absence of an express provision requiring the payment of dues and assessments in the restrictions, the owners still were required to pay their fair share of costs."  The context, however, demonstrates that this is not a complete summary of that case.  In *Nachman*, the appellees were property owners subject to deed restrictions that referenced an association and vested in the association the right to "enforce violations of breaches of * * * deed restrictions 'by appropriate legal action.'"  *Id.* at *5.  The association's regulations provided that the membership consisted of persons "who own a lot or lots *and pay yearly membership dues and assessments*" and defined the association's power to levy both.  (Emphasis added.)  *Id.* at *2.  The regulations also provided that the association could obtain a lien against the property and enforce collection of dues and assessments.  *Id.*

{¶19}  When the property owners involved in the case did not pay their dues and assessments, the association placed liens on their property and then filed a foreclosure action against the property owners.  *Id.* at *3.  The property owners argued that they were not members of the association, that the deed restrictions did not require them to be members, and that the

earlier litigation had not resolved the question of the validity of the liens. *Id*. The trial court determined that although not members, the property owners were required to contribute to the association for maintenance and upkeep, but limited their annual contribution to $30 and invalidated the association's liens. *Id.* The association appealed. The Sixth District Court of Appeals concluded that because the liens at issue were due to litigation expenses and not part of the "normal cost of operation" for the association, the liens were invalid. *Id*. at *8.

{¶20} The matter at issue in *Nachman* and in the trial court cases that preceded it was narrow: whether the homeowners association had the ability to assess liens against property owners who were not members of the association for contributions to operating expenses. *Nachman* did not address the issue in this case: whether a homeowners association without valid bylaws could limit the voting rights of its members. *Nachman*, therefore, is not, as the Minority Property Owners maintain, "on all fours with the present matter," nor does it not affect our resolution of the first assignment of error.

{¶21} Under R.C. 1702.13 and R.C. 1702.20(A), all members of the Association are entitled to vote on matters affecting the Association unless the corporate articles or bylaws provided otherwise. The trial court concluded that there was no evidence that bylaws were ever validly adopted before 2008 and, in their absence, correctly concluded that all property owners were entitled to vote on matters affecting the Association. The Minority Property Owners' first assignment of error is overruled.

## ASSIGNMENTS OF ERROR II-IV

> AS THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING [THE MAJORITY PROPERTY OWNERS] VOTING PRIVILEGES, THE COURT ALSO ERRED BY DISQUALIFYING THE ASSOCIATION'S PRIOR COUNSEL, OUSTING ITS OFFICERS, AND RECOGNIZING A SETTLEMENT THAT WAS AGREED TO BY THE NEW BOARD WITHOUT HOLDING A HEARING.

**{¶22}** The Minority Property Owners' second, third, and fourth assignments of error argue that because the trial court erred by concluding that voting rights were not limited by payment of dues and assessments, it follows that the trial court's later decisions to recognize the newly constituted board, permit the board to obtain new counsel, and "recogniz[e]" the settlement agreement were also incorrect. The Minority Property Owners have conceded that if this Court overrules their first assignment of error, these assignments of error are moot. We agree, and we decline to address their second, third, and fourth assignments of error. *See* App.R. 12(A)(1)(c).

## ASSIGNMENT OF ERROR V

> THE TRIAL COURT ERRED WHEN IT DENIED [THE MINORITY PROPERTY OWNERS'] MOTION FOR SUMMARY JUDGMENT AS TO [THE LENDER'S] COMPLAINT.

**{¶23}** In their fifth assignment of error, the Minority Property Owners have argued that the trial court erred by denying a purported motion for summary judgment on the lender's complaint for breach of a settlement agreement.

**{¶24}** The Minority Property Owners, however, did not actually file a motion for summary judgment on the lender's complaint. Because they were neither a "party seeking affirmative relief" nor a "defending party," they had no basis for doing so. *See generally* Civ.R. 56(A)/(B). The Minority Property Owners did file a document that was captioned, in part, "motion for summary judgment," but that document was filed in March 2008 in opposition to the lender's motion to enforce a purported settlement agreement. In any event, the lender and the Association reached agreement on a settlement in 2011, rendering the earlier motion to enforce – and the filings in opposition to it – moot. The Minority Property Owners' fifth assignment of error is overruled.

**ASSIGNMENTS OF ERROR VI AND VII**

THE TRIAL COURT ERRED WHEN IT DENIED THE ASSOCIATION'S MOTIONS TO AMEND [ITS] COUNTERCLAIMS AND CROSS-CLAIMS AND MOTION TO COMPEL PRODUCTION.

**{¶25}** The Minority Property Owners' last two assignments of error purport to challenge actions that the trial court took with respect to the Association during the course of the litigation. The Association, however, is an appellee in this appeal, represented by its own attorneys, and it has not assigned these decisions as error.

**{¶26}** In order to have standing to allege error, a party must assert its own rights rather than the rights of a third party. *Utility Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, ¶ 49. Although some circumstances permit third parties to assert the rights of others, the practice is generally disfavored. *Id.* The Ohio Supreme Court has adopted the test used by federal courts to determine whether third-party standing is appropriate, and therefore a third party has standing when it "(i) suffers its own injury in fact, (ii) possesses a sufficiently '"close" relationship with the person who possesses the right,' and (iii) shows some 'hindrance' that stands in the way of the claimant seeking relief." *E. Liverpool v. Columbiana Cty. Budget Comm.*, 114 Ohio St.3d 133, 2007-Ohio-3759, ¶ 22, quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129-130 (2004).

**{¶27}** In this case, the second element is not present. The Minority Property Owners cannot be said to have a close relationship with or alignment to the Association. Their interests in the underlying litigation and in this appeal are opposed, as demonstrated by the fact that the Minority Property Owners assign errors on behalf of the Association that the Association itself has chosen not to assert. "[C]ourts must hesitate before resolving a controversy * * * on the basis of the rights of third persons not parties to the litigation * * * [because] it may be that in

fact the holders of those rights * * * do not wish to assert them[.]" (Alterations in original.) *Utility Serv. Partners* at ¶ 51, quoting *Singleton v. Wulff*, 428 U.S. 106, 113-114 (1976).

**{¶28}** The Minority Property Owners do not have standing to assert these assignments of error on behalf of the Association. Their sixth and seventh assignments of error are overruled.

CROSS-APPEALS

**{¶29}** The Association and the Majority Property Owners cross-appealed in order to assert two assignments of error in the event that this Court reversed with respect to the Minority Property Owners' assignments of error. In light of our resolution of those assignments of error, the cross-appeals in C.A. Nos. 25909 and 25912 are moot. *See generally* App.R. 3(C)(1).

III

**{¶30}** The Minority Property Owners' assignments of error are overruled, and the judgment of the trial court is affirmed with respect to C.A. No. 25894. The cross-appeals in C.A. Nos. 25909 and 25912 are dismissed as moot.

Judgment affirmed
and cross-appeals dismissed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

CARLA MOORE
FOR THE COURT

CARR, J.
DICKINSON, J.
CONCUR.

APPEARANCES:

ROBERT D. KEHOE and KATHLEEN A. COLE, Attorneys at Law, for Appellants.

RODD A. SANDERS, Attorney at Law, for Appellee.

LANCE D. GILL, Attorney at Law, for Appellee.

LAWRENCE J. DELINO, JR., Attorney at Law, for Appellees/Cross-Appellants.