MARTIN MARIETTA MAGNESIA SPECIALTIES, L.L.C., APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

CALPHALON CORPORATION, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO, APPELLEE.

KRAFT FOODS GLOBAL, INC., APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO, APPELLEE.

WORTHINGTON INDUSTRIES, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO, APPELLEE.

BRUSH WELLMAN, INC., APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO, APPELLEE.

[Cite as *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129
Ohio St.3d 485, 2011-Ohio-4189.]

*Termination date of special contracts entered into under R.C. 4905.31 — Public*
*Utilities Commission erred in determining that it needed to refer to its*
*earlier electric-deregulation decisions to interpret the plain language of*
*the special contracts.*

(Nos. 2009-1064, 2009-1065, 2009-1067, 2009-1071, and 2009-1072 —
Submitted May 24, 2011 — Decided August 25, 2011.)

APPEAL from the Public Utilities Commission of Ohio, No. 08-893-EL-CSS.

APPEAL from the Public Utilities Commission of Ohio, No. 08-145-EL-CSS.

APPEAL from the Public Utilities Commission of Ohio, No. 08-146-EL-CSS.

APPEAL from the Public Utilities Commission of Ohio, No. 08-67-EL-CSS.

APPEAL from the Public Utilities Commission of Ohio, No. 08-254-EL-CSS.

_____

O'DONNELL, J.

## I. Introduction

{¶ 1} Martin Marietta Magnesia Specialties, L.L.C., the Calphalon Corporation, Kraft Foods Global, Inc., Worthington Industries, and Brush

Wellman, Inc., each appeal from a decision of the Public Utilities Commission of Ohio ("PUCO") that established February 2008 as the termination date for special contracts they entered into with the Toledo Edison Company for the sale of electricity. These special contracts had been approved by the PUCO pursuant to R.C. 4905.31, which permits "reasonable arrangements" between public utilities and their customers. Generally, such contracts include arrangements that differ from the standard rate schedules and are often tailored to a specific customer's service.

{¶ 2} The parties to these appeals have asked us to determine the termination date of appellants' special contracts with Toledo Edison. Appellants contend that Toledo Edison agreed in 2001 that the contracts would not terminate until Toledo Edison stopped collecting regulatory-transition charges from its customers. Appellants further contend that their contracts did not expire until December 31, 2008, the date when Toledo Edison stopped collecting regulatory-transition charges.

{¶ 3} In contrast, intervening appellee Toledo Edison and the PUCO maintain that the special contracts expired in February 2008, as provided by the commission's orders in electric-deregulation cases involving Toledo Edison.

{¶ 4} The PUCO found that based on the language of the special contracts and its orders in the earlier electric-deregulation cases, the contracts terminated in February 2008. The commission erred in this determination, and we accordingly reverse its order and enter judgment in favor of appellants.

## II. Facts

{¶ 5} In 2008, appellants filed complaints pursuant to R.C. 4905.26 against Toledo Edison with the Public Utilities Commission of Ohio. See PUCO case No. 08-893-EL-CSS (Martin Marietta); PUCO case No. 08-145-EL-CSS (Calphalon); PUCO case No. 8-146-EL-CSS (Kraft); PUCO case No. 08-67-EL-CSS (Worthington); and PUCO case No. 08-254-EL-CSS (Brush Wellman). In

proceedings before the commission, the attorney examiner consolidated the five complaints, and the parties then filed joint stipulations of fact.

{¶ 6} Between 1990 and 1997, Toledo Edison entered into an electric-service contract with each appellant, and those contracts became valid after approval by the commission pursuant to R.C. 4905.31. According to the terms of these contracts, appellants received discount pricing for electric service below the standard tariff rates charged by Toledo Edison to other large industrial customers.

{¶ 7} On October 5, 1999, the General Assembly enacted Am.Sub.S.B. No. 3, codified as R.C. Chapter 4928, which restructured Ohio's electric-utility industry to allow retail customers to buy electric service from providers other than local electric-service providers. Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("S.B. 3"). Following passage of that legislation, in a series of cases involving Toledo Edison and other electric utilities, the PUCO attempted to ease the transition from a regulated rate structure to a market rate structure. See Toledo Edison's electric-transition-plan case, case No. 99-1212-EL-ETP; rate-stabilization-plan case, case No. 03-2144-EL-ATA; and rate-certainty-plan case, case No. 05-1125-EL-ATA (collectively, "the S.B. 3 cases").

{¶ 8} Through a series of agreed stipulations and commission orders in the S.B. 3 cases, special-contract customers were able to extend the duration of their contracts with Toledo Edison.

{¶ 9} In the first S.B. 3 case, Toledo Edison's electric-transition-plan case, special-contract customers were given a one-time opportunity to extend their special contracts, provided that those customers agreed to the offer by December 31, 2001. None of the appellants was a party to the electric-transition-plan case, but each received notice of the offer to extend its special contracts from Toledo Edison pursuant to the electric-transition-plan stipulation and the commission's order approving that stipulation. Each accepted the offer to extend the terms of its

contract with Toledo Edison until the date that Toledo Edison stopped collecting its regulatory-transition charges.

{¶ 10} Thereafter, each appellant amended its agreement with Toledo Edison, referred to as "the 2001 Amendments." Each agreement contained the following language: "This Agreement, as amended, shall terminate with the bill rendered for the electric usage through the date which RTC ceases for the [Toledo Edison] Company." The contracts defined "RTC" as regulatory-transition charges.

{¶ 11} The next opportunity to extend these contracts occurred in the second S.B. 3 case, Toledo Edison's rate-stabilization-plan case. In that case, the commission again approved a joint stipulation filed by Toledo Edison and other parties allowing Toledo Edison's customers to extend the term of any special contract beyond the extension approved in the electric-transition-plan case. However, unlike the electric-transition-plan case, neither the rate-stabilization-plan stipulation nor the commission's order required Toledo Edison to notify its special-contract customers of the opportunity to extend, and Toledo Edison did not directly communicate with appellants or any other special-contract customer regarding this option. None of Toledo Edison's special-contract customers, including appellants, was a party to the rate-stabilization-plan case. Despite this, nine of Toledo Edison's 46 special-contract customers requested Toledo Edison to extend the terms of their special contracts, and Toledo Edison agreed. None of the appellants in this case, however, submitted a similar request to Toledo Edison to extend the term of its contract.

{¶ 12} Another stipulated contract extension was approved in the third S.B. 3 case, Toledo Edison's rate-certainty-plan case. This stipulation provided that those special contracts that were extended under the rate-stabilization-plan case would continue in effect until December 31, 2008. The stipulation further provided that special contracts extended under the electric-transition-plan case but

4

not under the rate-stabilization-plan case—such as appellants' contracts—would continue in effect until February 2008. The stipulation stated that the February 2008 termination date for such contracts was "consistent with the [electric-transition-plan's] method of calculation of the contract end dates."

{¶ 13} The commission's order in the rate-certainty-plan case also authorized Toledo Edison to continue to recover regulatory-transition charges through December 31, 2008. Accordingly, Toledo Edison continued to recover regulatory-transition charges after February 2008, through December 31, 2008. Notably, appellants were not parties to the rate-certainty-plan case and were not notified that an end date for special contracts would be established in that case.

{¶ 14} Thus, following the order in the rate-certainty-plan case, appellants' contracts were arguably scheduled to terminate (1) according to the contracts, upon the termination of the regulatory-transition charges and (2) according to the rate-certainty-plan order, in February 2008.

{¶ 15} Between February 2006 and September 2007, Toledo Edison informed appellants that their special contracts would terminate in February 2008, and in response, between January and July 2008, appellants filed the underlying complaints, alleging that Toledo Edison's attempt to unilaterally change the plain language of the special contracts was unreasonable and unlawful. According to appellants, the 2001 Amendments to their special contracts provided that the contracts were to terminate on the date that Toledo Edison stopped collecting regulatory-transition charges, which turned out to be December 31, 2008. Appellants complained that despite this provision of the contract, Toledo Edison intended to terminate the contracts in February 2008, the date set by the commission in the third S.B. 3 case, ten months before the utility ceased collecting the regulatory-transition charges.

{¶ 16} Toledo Edison subsequently entered into escrow agreements with Worthington, Calphalon, Kraft, and Brush Wellman, whereby those appellants

agreed to escrow the difference between what those appellants and Toledo Edison alleged should be the cost of electric service between February 2008 and December 31, 2008. There is no escrow agreement between Martin Marietta and Toledo Edison.

{¶ 17} On February 19, 2009, the commission issued its order dismissing appellants' complaints. The commission found that appellants' special contracts terminated in February 2008, and it noted that the electric-transition-plan stipulation provided that Toledo Edison's collection of regulatory-transition charges would continue until its cumulative distribution sales reached a certain level based on the number of kilowatt-hours. The commission concluded that the February 2008 contract end date—which was established in the rate-certainty-plan case—was consistent with the electric-transition-plan stipulation's "original method of calculation" of the contract-termination dates agreed to by Toledo Edison and appellants in the 2001 Amendments. Because the electric-transition-plan stipulation formed the basis for the 2001 Amendments, the commission concluded that appellants had agreed to Toledo Edison's "offer" that the electric-transition plan's method of calculation would determine the termination dates for appellants' special contracts.

{¶ 18} Appellants timely filed a joint application for rehearing, but the commission denied that application.

{¶ 19} These appeals followed. Because the appeals share identical facts and legal issues, we consolidated these cases for briefing and oral argument. 122 Ohio St.3d 1463, 2009-Ohio-3385, 909 N.E.2d 639. Appellants jointly raise four propositions of law. For the reasons discussed below, we sustain appellants' first proposition of law, reverse the commission's orders, and do not reach the remaining propositions of law.

### III. Standard of Review

{¶ 20} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id.

### IV. Appellants' First Proposition of Law

{¶ 21} In their first proposition of law, appellants contend that the commission erred when it failed to apply the clear and unambiguous language of the 2001 Amendments to their special contracts. They argue that the 2001 Amendments expressly state that their contracts would terminate on the date that Toledo Edison ceased its collection of regulatory-transition charges, i.e., December 31, 2008, but Toledo Edison terminated their contracts in February 2008. Appellants therefore argue that the commission unlawfully and unreasonably disregarded the plain language of the 2001 Amendments when it allowed Toledo Edison to terminate appellants' contracts in February 2008, ten months before the regulatory-transition-charges ended.

*A. The PUCO ignored the plain language of the 2001 Amendments*
*to appellants' special contracts*

{¶ 22} When confronted with an issue of contract interpretation, the role of the court is to give effect to the intent of the parties to that agreement. The court examines the contract as a whole and presumes that the intent of the parties

is reflected in the language used in the agreement. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "Where the parties following negotiation make mutual promises which thereafter are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain language of the contract provides." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 544 N.E.2d 920, paragraph one of the syllabus. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Galatis* at ¶ 11. Evidence cannot be introduced to show an agreement between the parties that is materially different from that expressed by the clear and unambiguous language of the instrument. *Blosser v. Enderlin* (1925), 113 Ohio St. 121, 148 N.E. 393, paragraph two of the syllabus. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Galatis* at ¶ 11.

{¶ 23} The 2001 Amendments to appellants' special contracts provided that those contracts "shall terminate with the bill rendered for the electric usage through the date which [the regulatory-transition charge] ceases for the [Toledo Edison] Company." This language is clear and unambiguous. Accordingly, the commission was bound to give effect to the parties' intent, as expressed in the plain language of the agreements.

{¶ 24} Contrary to the commission's determination that appellants and Toledo Edison had agreed in the 2001 Amendments that the contract-termination dates would be determined by a calculation that tied regulatory-transition charges to Toledo Edison's distribution sales, nothing in the 2001 Amendments specifies that appellants' special contracts would end when Toledo Edison's distribution sales reach a certain level. Because no such provision was included, and because the actual termination provision is unambiguous, the commission should have

determined the intent of the parties to the special contracts from the four corners of the document.

{¶ 25} The parties here agreed that the termination date of the contracts would be the termination of the regulatory-transition charges. Thus, based on the plain language of these agreements, Toledo Edison should not have been allowed to terminate appellants' special contracts in February 2008; rather, they remained in effect until December 31, 2008, when the utility ceased collecting the regulatory-transition charges.

*B. Counterarguments of Toledo Edison and the PUCO*

{¶ 26} In response to appellants' first proposition of law, Toledo Edison and the PUCO raise four counterarguments. None has merit.

1. The S.B. 3 cases did not provide the language of the

special contracts with special meaning

{¶ 27} On appeal, the PUCO argues that the S.B. 3 cases were an integral part of appellants' special contracts and provided special meaning to the language used in the agreements. The PUCO maintains that appellants' special contracts are entirely dependent on the commission's S.B. 3 orders because (1) the contracts were first extended through the 2001 Amendments pursuant to the electric-transition-plan case and (2) the commission fixed the end point of Toledo Edison's collection of regulatory-transition charges in the rate-certainty-plan case.

{¶ 28} For its part, Toledo Edison contends that it would be impossible to determine the intent of the contracting parties without reference to the commission's orders in the S.B. 3 cases. In Toledo Edison's view, the commission necessarily had to review the circumstances surrounding the 2001 Amendments to the special contracts to determine the meaning of "regulatory-transition charges" and when those charges would cease according to the agreements. Otherwise, Toledo Edison avers, the termination language contained in the 2001 Amendments had no meaning.

{¶ 29} We recognize that when circumstances surrounding an agreement invest the language of the contract with a special meaning, extrinsic evidence can be considered in an effort to give effect to the parties' intention. See *Shifrin v. Forest City Ents., Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus. See also *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949, *Latina v. Woodpath Dev. Co.* (1991), 57 Ohio St.3d 212, 214, 567 N.E.2d 262.

{¶ 30} However, the circumstances do not show that the commission's orders in the S.B. 3 cases invested the language of the special contracts with any special meaning or reflected the intent of the contracting parties. None of the appellants was a party to the S.B. 3 cases or joined in the stipulations approved by the commission in those cases. Further, the 2001 Amendments did *not* tie termination of the contracts to Toledo Edison's distribution sales reaching a certain level. Rather, the 2001 Amendments tied termination of the contracts to the end of the regulatory-transition charges. Thus, the commission erred in relying on the S.B. 3 cases to alter the plain meaning of appellants' special contracts and in allowing Toledo Edison to terminate the special contracts in February 2008, when it continued to collect regulatory-transition charges until December 2008.

2. The commission did not invoke its authority under R.C. 4905.31

to supervise or modify the special contracts

{¶ 31} Both Toledo Edison and the PUCO contend that appellants' special contracts are "reasonable arrangements" pursuant to R.C. 4905.31, and as such, are subject to the commission's continuing supervision and regulation, and they maintain that the commission acted within this authority when it determined the end dates for appellants' contracts. The PUCO further argues that R.C. 4905.31 gives the commission authority to modify appellants' special contracts.

{¶ 32} There is no dispute that pursuant to R.C. 4905.31, the commission has authority to regulate, supervise, and modify special contracts. But nowhere in the commission's orders in this case did it claim to be using that authority to supervise, regulate, or modify appellants' special contracts. In fact, the commission *expressly denied* on rehearing that it had modified the terms of these special contracts in the underlying cases. Given that the commission never invoked the authority provided by R.C. 4905.31 in the proceedings below and affirmatively disclaimed that it was modifying the contracts, it cannot defend its decision on that basis on appeal.

### 3. Toledo Edison's regulatory-transition charges did not cease on January 1, 2006

{¶ 33} Both Toledo Edison and the PUCO claim that the collecting of regulatory-transition charges referred to in the 2001 Amendments ended long before appellants' special contracts were terminated in February 2008. Specifically, they contend that Toledo Edison stopped collecting those particular regulatory-transition charges on January 1, 2006. Therefore, they contend, the commission properly determined that the contracts did not extend to December 31, 2008.

{¶ 34} According to Toledo Edison and the PUCO, the rate-certainty-plan case ordered that new regulatory charges—the "RTC rate components," which are made up of regulatory-transition charges and extended regulatory-transition charges—were to replace the regulatory-transition charges referred to in the 2001 Amendments. According to appellees, the extended regulatory-transition charges replaced the regulatory-transition charges referred to in the 2001 Amendments to appellants' contracts. That is, the PUCO and Toledo Edison concede that Toledo Edison continued to collect regulatory-transition charges after January 1, 2006, but they maintain that those charges were not the same regulatory-transition charges originally tied to the termination of the special contracts. Instead, they

claim that those "original" regulatory-transition charges ended in January 2006 and that Toledo Edison collected the RTC rate components after January 2006 and until December 31, 2008.

{¶ 35} During oral argument before this court, counsel for the PUCO contradicted the statements in the PUCO brief and claimed that Toledo Edison stopped collecting regulatory-transition charges in February 2008, rather than January 2006. Counsel maintained that the regulatory-transition charges referred to in appellants' special contracts were designed to recover different costs than those costs intended to be recovered by the extended regulatory-transition charges. Counsel explained that the regulatory-transition charges were implemented to recover Toledo Edison's "stranded" costs, while the extended regulatory-transition charges recovered Toledo Edison's deferred fuel costs. The PUCO's counsel argued that the regulatory-transition charges set forth in the 2001 Amendments were no longer being collected, because Toledo Edison was no longer recovering its stranded costs. Rather, according to counsel, from February 2008 until the end of December 2008, Toledo Edison was recovering its deferred fuel costs solely through the collection of the *extended* regulatory-transition charges.

{¶ 36} However, these arguments are contradicted by the agreed stipulation of facts that the commission relied on to resolve this case. Toledo Edison and appellants filed a joint stipulation of facts in these cases when they were before the commission that stated that the rate-certainty-plan case "authorized [Toledo Edison] to recover [regulatory-transition charges] through December 31, 2008, and [Toledo Edison] has continued to recover [regulatory-transition charges] after [appellants'] February 2008 billing dates." The parties further stipulated that Toledo Edison "project[ed] its Regulatory Transition Charge will cease on or before December 31, 2008."

{¶ 37} The joint stipulation was submitted into evidence on July 23, 2008, well after the dates (January 1, 2006, and February 2008) on which Toledo Edison and the PUCO now allege that regulatory-transition charges had ended. Moreover, although the agreed stipulation refers to both the regulatory-transition charges and the extended regulatory-transition charges, the stipulation makes no distinction between the regulatory-transition charges referred to in the 2001 Amendments and those discussed in the rate-certainty-plan case.

{¶ 38} Toledo Edison stipulated that it did not stop collecting regulatory-transition charges until December 31, 2008. If Toledo Edison had been collecting only extended regulatory-transition charges or the RTC rate components between February and December 2008—as it and the PUCO now allege—certainly Toledo Edison could have stipulated to that fact or litigated the issue. For whatever reason, Toledo Edison did neither.

{¶ 39} Further, the commission never found that Toledo Edison had stopped collecting regulatory-transition charges on January 1, 2006, or in February 2008, or at any other time before December 31, 2008. If Toledo Edison had actually stopped collecting regulatory-transition charges in February 2008, the commission would have said so. Instead, the commission held that the contract-termination dates were consistent with the "method of calculation" for when regulatory-transition charges *should* have ended, not when those charges *actually* ended.

4. Appellants' complaints were not an improper collateral attack

on the commission's prior orders

{¶ 40} Appellants filed complaints pursuant to R.C. 4905.26 challenging Toledo Edison's right to terminate the special contracts in February 2008. The commission dismissed appellants' complaints, finding in part that the complaints were an improper collateral attack upon the commission's orders in the rate-stabilization-plan and rate-certainty-plan cases, the latter of which established the

contract-termination dates. According to the commission, to allow appellants to collaterally attack its prior decisions "at this late date" may give appellants an unfair advantage over other special-contract customers who followed those cases and took the risk of extending their contracts when today's market rates were unknown. Toledo Edison and the PUCO claim on appeal that the commission acted reasonably and lawfully in dismissing appellants' complaints on this ground.

{¶ 41} Contrary to the commission's finding, its prior orders can be collaterally attacked through R.C. 4905.26 complaint proceedings. We have long held that "R.C. 4905.26 is broad in scope * * *. [R]easonable grounds may exist to raise issues which might strictly be viewed as 'collateral attacks' on previous orders." *Allnet Communications Servs., Inc. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 115, 117, 512 N.E.2d 350, citing *W. Res. Transit Auth. v. Pub. Util. Comm.* (1974), 39 Ohio St.2d 16, 68 O.O.2d 9, 313 N.E.2d 811.

{¶ 42} As to the commission's concern that appellants may have gained an unfair advantage over those Toledo Edison special-contract customers who extended their contracts when today's market prices were unknown, that concern is irrelevant to the critical issue before us: the meaning of the language contained in the 2001 Amendments to appellants' special contracts.

{¶ 43} Intertwined with its collateral-attack argument, Toledo Edison also raises the equitable defenses of waiver and laches. Toledo Edison complains that it informed appellants of the February 2008 actual termination of their contracts in 2006 and 2007, but the first appellant to file a complaint with the commission challenging the termination date waited until January 2008 to do so. These defenses are not well taken.

{¶ 44} Waiver is a voluntary relinquishment of a known legal right. *State ex rel. Madden v. Windham Exempted Village School Dist. Bd. of Edn.* (1989), 42 Ohio St.3d 86, 89, 537 N.E.2d 646. Appellants filed their complaints with the

commission between January and July 2008, at the latest only a few months after Toledo Edison's attempt to terminate the contracts in February 2008. Toledo Edison offers no argument or evidence as to how appellants have voluntarily waived their claims.

{¶ 45} Toledo Edison's laches argument also lacks merit. The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for such a delay, (3) knowledge—actual or constructive—of the injury or wrong, and (4) prejudice to the other party. *State ex rel. Cater v. N. Olmsted* (1994), 69 Ohio St.3d 315, 325, 631 N.E.2d 1048. Toledo Edison must establish all four elements, but it has not shown that there was any unreasonable or prejudicial delay in this case. At most, a four-month window occurred between termination of the contracts and litigation.

*C. Conclusion to First Proposition of Law*

{¶ 46} Appellants' first proposition of law is well taken. The commission erred in determining that evidence of the stipulations and orders in Toledo Edison's electric-transition-plan and rate-certainty-plan cases were needed to interpret the plain language of the 2001 Amendments, which provided that appellants' special contracts were to continue until Toledo Edison stopped collecting the regulatory-transition charges. That occurred on December 31, 2008. Accordingly, the commission unlawfully and unreasonably allowed Toledo Edison to terminate the special contracts in February 2008.

**V. Appellants' Second, Third, and Fourth Propositions of Law**

{¶ 47} Due to our disposition of the first proposition of law, we need not address appellants' remaining propositions of law.

**VI. Conclusion**

{¶ 48} The decision of the commission is reversed, and we enter judgment for appellants.

Orders reversed.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Craig I. Smith; Kravitz, Brown & Dortch, L.L.C., and Michael D. Dortch; Bricker & Eckler, L.L.P., Thomas J. O'Brien, and Matthew W. Warnock; and Crowell & Moring, L.L.P., and Daniel W. Wolff, for appellants.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas W. McNamee and John H. Jones, Assistant Attorneys General, for appellee.

Calfee, Halter & Griswold, L.L.P., James F. Lang, and N. Trevor Alexander, for intervening appellee.

_____