[Cite as *In re Application of Duke Energy Ohio, Inc.,* 131 Ohio St.3d 487, 2012-Ohio-1509.]

IN RE APPLICATION OF DUKE ENERGY OHIO, INC., TO ESTABLISH AND ADJUST THE INITIAL LEVEL OF ITS DISTRIBUTION RELIABILITY RIDER; DUKE ENERGY OHIO, INC., APPELLANT; PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *In re Application of Duke Energy Ohio, Inc.,*
131 Ohio St.3d 487, 2012-Ohio-1509.]

*Public utilities—Utility sought to recover $30 million for costs of restoring its system following hurricane-wind damage—Commission order allows utility to recover $14.1 million—Utility bore the burden of proving that its expenses were reasonable—Order affirmed.*

(No. 2011-0767—Submitted February 7, 2012—Decided April 5, 2012.)

APPEAL from the Public Utilities Commission of Ohio, No. 09-1946-EL-RDR.

_____

PFEIFER, J.

{¶ 1} Duke Energy Ohio, Inc. ("Duke") sought to recover over $30 million for the costs of restoring its system following the destruction caused by Hurricane Ike. The Public Utilities Commission allowed Duke to recover roughly half that amount, finding that several of its requests lacked adequate supporting evidence. Duke has appealed, raising five propositions of law.

{¶ 2} Each of Duke's arguments lacks merit. The commission reduced the amount that Duke could recover because it found substantial problems with the supporting evidence. Because the record confirms the commission's finding, we affirm.

**Factual and Procedural Background**

{¶ 3} In September 2008, powerful winds unleashed by Hurricane Ike swept north across the Midwest. The storm left almost two million Ohioans without power and inflicted major damage on the electrical infrastructure of Duke

and its affiliates in Kentucky and Indiana. It took nine days for Duke to restore power to all of its customers. Employees of the three affected Duke companies (Ohio, Indiana, and Kentucky) performed restoration work in all three jurisdictions, along with employees of Duke's corporate service company and independent contractors.

{¶ 4} The commission permitted Duke to compile its storm costs and file an application to recover those costs. *In re Application of Duke Energy Ohio*, Pub. Util. Comm. No. 08-709-EL-AIR, 2009 WL 124218 (Jan. 14, 2009). Duke filed a cost-recovery application, asking for reimbursement of roughly $30.7 million. This case is Duke's appeal from the commission's order approving recovery of some but not all of the costs for which Duke applied. As Duke acknowledged in its application, it bore "the burden of proof of demonstrating that the costs were prudently incurred and reasonable."

{¶ 5} Other parties to the case argued that Duke was not entitled to the full amount sought. The commission's staff reviewed Duke's application and proposed reducing Duke's recovery by roughly $1 million. The Office of the Ohio Consumers' Counsel ("OCC"), which had intervened, also investigated Duke's request. Its witness pointed out numerous problems with the evidence supporting Duke's request and argued that Duke should recover approximately $5.1 million.

{¶ 6} The commission agreed that there were significant problems with Duke's evidence and allowed Duke to recover $14.1 million, about half of what it had requested. Duke has now appealed.

## Discussion

{¶ 7} Duke raises five propositions of law, all variations on the theme that the commission's order lacked record support. We are not persuaded.

{¶ 8} Duke seems to generally misapprehend a basic point of procedure in this case—namely, that it bore the burden of proving that its expenses were

reasonable. It acknowledged this point in its application, stating that it "will bear the burden of proof of demonstrating that the costs were prudently incurred and reasonable." So Duke had to prove a positive point: that its expenses had been prudently incurred. The commission did not have to find the negative: that the expenses were imprudent. Accordingly, if the evidence was inconclusive or questionable, the commission could justifiably reduce or disallow cost recovery.

{¶ 9} On appeal, Duke shows, at best, that other parties did not conclusively prove that the claimed expenses were unreasonable or imprudent— but that claim is irrelevant because those parties did not bear the burden of proof. Duke had not been given a blank check, but an opportunity to prove to the commission that it had reasonably and prudently incurred the costs it sought to recover. In certain respects, it failed to make the most of that opportunity.

{¶ 10} The commission's reasons for reducing the amount that Duke can recover make sense. And Duke's arguments on appeal, to which we now turn, do not upset the commission's findings.

### 1. Duke did not establish that giving supplemental pay to salaried workers was reasonable

{¶ 11} In its first proposition of law, Duke argues that the commission erred by "precluding recovery of supplemental compensation for salaried employees." Salaried employees usually do not receive extra pay for extra hours of work, but Duke requested roughly $3.2 million to compensate itself for making supplemental payments to salaried workers. Duke explained to the commission that these bonuses were paid "[a]t management's discretion," but the company did not put on testimony explaining what the employees had done to deserve the extra pay. The commission denied recovery, finding that Duke had "failed to show a reasonable basis on which the supplemental compensation was determined."

{¶ 12} Duke has not shown error in this decision. Duke's arguments do not refute the commission's finding that Duke did not explain its bonus-pay

decisions. The company argues that salaried employees played "a key role" in restoring service and that by having its salaried employees do extra work, the company reduced the need to use expensive contractors. Therefore, it argues, the employees deserved extra pay. Duke's argument may support the general decision to use salaried employees, but it does not address the commission's concern that Duke did not explain specifically how it had determined the amount of the bonuses.

{¶ 13} Duke has not pointed to evidence that contradicts the commission's finding that Duke failed to show a reasonable basis on which the supplemental compensation was determined. On the contrary, the only witness Duke cites in support of its bonus-pay decisions had no personal knowledge of why any particular employee received a particular bonus. When asked, "[W]ho determines how much [supplemental compensation] someone is paid?" the witness answered, "[T]he establishment of what will be paid in terms of magnitude of supplemental compensation * * * is not part of my job duties, nor was I involved in that decision." This affirmatively supports what the commission found: Duke did not explain how it determined the specific awards of supplemental compensation.

{¶ 14} Duke's other argument—that "the Commission has no jurisdiction over which employees were paid and how much such employees received"—misses the point. The jurisdictional issue is not whether the commission may tell Duke how much to pay its employees. The issue is whether the commission has jurisdiction to review the prudence of the expenses a utility seeks to recover. Duke has not only failed to raise any argument against such jurisdiction, it expressly submitted to it in filing the underlying application.

{¶ 15} We reject Duke's first proposition of law.

### 2. Duke did not provide adequate record support
### for its fact-bound argument

**{¶ 16}** In its second proposition of law, Duke challenges the commission's decision to disallow $371,196 on the grounds that it reflected "salaries * * * already recovered in Duke's base rates." Duke argues that this sum did not represent salaries but instead represented the costs associated with the time that certain employees allocated to the power-restoration efforts. The company asserts that the sum "represents actual costs incurred by Duke Energy Ohio, over and above the labor costs that form a part of its base rates" and were "specifically related to the cleanup effort."

**{¶ 17}** Several essential premises of Duke's arguments are factual: Duke incurred certain costs, these costs related to the cleanup effort, and Duke's current base rates do not already recover these costs. But these factual assertions are unsupported by citations to the record. The pertinent section of Duke's brief contains a single citation to the record, which leads to the second page of a 51-page spreadsheet that OCC had introduced into the record. The page contains no explanation or narrative and appears to be unaccompanied by sworn testimony. It is unclear how it supports any of Duke's factual assertions.

**{¶ 18}** Duke's failure to support essential factual assertions with citations to the record is fatal to its argument. *Allnet Communications Servs., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 206, 638 N.E.2d 516 (1994) (rejecting argument when appellant "provided no further reasoning or record citations to support" it); *cf. State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd.*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 13 ("Appellate attorneys should not expect the court 'to peruse the record without the help of pinpoint citations' to the record"), quoting *Day v. N. Indiana Pub. Serv. Corp.*, 164 F.3d 382, 384 (7th Cir.1999). On this basis, we reject Duke's second proposition of law.

3. Duke shows no error in the commission's reduction of recovery

for labor loaders and supervision costs

{¶ 19} In its third proposition, Duke argues that the commission unreasonably disallowed recovery for approximately $2 million in "labor loaders and supervision costs." ("Labor loaders" refers to "such items as the cost of fringe benefits and payroll taxes" associated with labor costs.) This disallowance was tied to the reductions discussed in the first and second propositions of law.

{¶ 20} Duke makes several arguments concerning the disallowance of the labor loaders, but none has merit. First, Duke claims that there should have been no reductions because these costs were tied to the supplemental compensation that Duke argued was unlawfully disallowed in its first two propositions of law. As we have rejected Duke's first two propositions of law, this argument is a nonstarter.

{¶ 21} Alternatively, Duke argues that even if some labor-loader reduction were warranted, the commission cut too much. The commission, it says, cannot rely on "a generalized formula" to reduce costs when "a utility submits discrete testimony on the charges it has incurred." Duke cites no legal authority in support of this proposition. Even if it were true, Duke does not provide the necessary record support. It states that it "submitted detailed evidence of its labor costs, including labor loaders and supervision," but it provides no citation to the record in support of this assertion and makes no further explanation.

{¶ 22} Finally, Duke claims that the commission "fail[ed] to account for reductions amounting to $800,461 that were previously implemented by [Duke]" at the commission's suggestion. Here, Duke does refer to the record, but to no effect. It cites no testimony but directs us, without explanation, to page 21 of a 142-page spreadsheet exhibit entitled "OCC-POD-02-021 attachment." What this

particular array of numbers means is not self-evident, but it does not clearly establish that the commission erred in making this reduction.

{¶ 23} Duke also argues that the commission erred in calculating the reduction of allowed supervision costs. Duke again fails to marshal supporting evidence for its argument. Its theory seems to be that the supervision costs were tied to an allowed expense (base salaries) and not a disallowed one (supplemental compensation), and therefore that the supervision costs should have been recoverable. But the only support Duke provides for this argument is a "*see generally*" cite to a 142-page spreadsheet exhibit shared during discovery. We do not see how these pages, filled with thousands of rows of numbers, support Duke's argument.

{¶ 24} We reject the third proposition of law.

4. Duke has not shown error in the commission's disallowance
of labor costs it paid for its affiliates' employees

{¶ 25} Duke's fourth proposition concerns its attempt to recover the labor costs it paid for employees of its Indiana and Kentucky affiliates who performed restoration work in Ohio. OCC had raised the concern that Ohio ratepayers might be "charged for work performed by employees of Duke affiliates" who "are paid already by ratepayers in other jurisdictions." To remedy this, OCC proposed an offset: reduce the recovery of payments for labor by employees of affiliates by any payments that affiliates made to Duke for labor supplied by Ohio employees in other jurisdictions. OCC sought information from Duke regarding such payments, but the company "refused to answer any interrogatories or data requests that deal[t] with other jurisdictions." Lacking this information, OCC's witness used some publicly available information to estimate how much Duke had been paid by the affiliates and thus how much to reduce Duke's recovery.

{¶ 26} Persuaded by OCC, the commission found that Duke "did not sustain its burden to prove that all of the affiliate-related costs * * * should be

recovered." Thus, it reduced Duke's recovery by the amount recommended by OCC, approximately $1.3 million. On rehearing, the commission affirmed its decision, specifically pointing out that the record was "essentially devoid of any evidence rebutting" the commission's conclusion that the reduction was justified. Duke needs to show this court that the opposite was true, namely, that record evidence conclusively showed how much Duke had been paid by its affiliates. But Duke identifies only a single piece of information in rebuttal: an "accounting adjustment" for such payments in the amount of $3,385. This evidence does not help Duke's cause for several reasons.

{¶ 27} First, Duke does not actually cite evidence showing a $3,385 accounting adjustment. It cites two pages of its supplement—pages 105 and 500—neither of which shows the claimed adjustment. Page 105 is a discovery request from OCC. Duke's only response on that page is "See Attachment OCC-POD-02-021." Page 500 contains lines 1063 to 1121 of a dense spreadsheet. What should be made of either page is unclear.

{¶ 28} Moreover, even if we accept for the sake of argument that the record showed a $3,385 accounting adjustment, other evidence contradicted it. OCC's witness introduced evidence that Duke's Kentucky affiliate had disclosed to Kentucky regulators that it had been charged just under $308,000 for the labor of Duke's employees—much higher than the claimed $3,385. Faced with such contradictory evidence, the commission was entitled to reduce Duke's recovery. That the commission used an estimate to do so avails Duke nothing because Duke had the burden of proof, and it has not adduced any evidence countering the commission's reduction.

{¶ 29} Duke's other arguments on this issue are insubstantial and need not be discussed.

{¶ 30} We reject Duke's fourth proposition of law.

5. Duke has not shown that the commission erred

in reducing Duke's recovery for contractor costs

**{¶ 31}** In Duke's fifth and final proposition of law, it argues that the commission erred in reducing its recovery of payments to contractors. Duke asked for approximately $13 million for payments to contractors, but its supporting data suggested that some of the work by those contractors had been done in other states. For example, internal spreadsheets listed Duke's Indiana and Kentucky affiliates as the "PayCo" or "Pay Company" for some of the contractors. Likewise, OCC's witness testified that information concerning work location had been whited out "over and over again on different time sheets." In at least one case, however, the last three letters of the word "Kentucky" were legible. Other sheets lacked any information regarding work location. Based on these "discrepancies in the documentation for contractor expenses," the commission found that Duke had "failed to substantiate what [its actual contractor] costs are." Accordingly, it permitted Duke to recover only a portion of those costs, about $3.5 million.

**{¶ 32}** Duke's arguments against these reductions do not warrant a reversal. Duke has shown neither that the evidence of discrepancies was faulty nor that the weight of the evidence unquestionably compelled a decision in its favor. In the pertinent section of its brief, Duke at best offers an alternative take on the evidence. As we have explained before, reweighing the evidence is outside the scope of our function on appeal. *Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 35.

**{¶ 33}** We reject Duke's fifth proposition of law.

### Conclusion

**{¶ 34}** For the foregoing reasons, we affirm the commission's order.

Order affirmed.

O'CONNOR, C.J., and LANZINGER, CUPP, and MCGEE BROWN, JJ., concur. LUNDBERG STRATTON and O'DONNELL, JJ., dissent.

_____

**O'DONNELL, J., dissenting.**

{¶ 35} Respectfully, I dissent.

{¶ 36} This case concerns whether Duke Energy Ohio, Inc., reasonably and prudently incurred over $30 million in storm restoration costs when it responded to the unprecedented damage caused by Hurricane Ike on this state. The Public Utilities Commission determined that the utility had failed to substantiate the reasonableness of its expenditures and therefore reduced recovery by more than $14 million. Among other charges that the commission determined that Duke Energy Ohio could not recover, the commission concluded that the utility could not charge ratepayers for the $3.2 million in supplemental compensation that it paid to salaried employees who worked overtime in the power-restoration effort and that it could not recover almost $10 million of the contractor costs it incurred, based on the conclusion that the contractors' invoices failed to prove that contractors actually performed work in Ohio.

{¶ 37} In my view, the commission reached its decision by unreasonably relying mainly on the testimony of a single expert witness who formulated opinions based on speculation and generalization about all the evidence from an incomplete review of the actual evidence in the case. Accordingly, I would reverse the commission's decision and remand the matter for further proceedings.

**Standard of Review**

{¶ 38} Our standard of review is set forth in R.C. 4903.13, which provides that "[a] final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or

unreasonable." As we explained in *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129 Ohio St.3d 485, 2011-Ohio-4189, 954 N.E.2d 104,

> [w]e will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty.

*Id.* at ¶ 20.

### Supplemental Compensation

{¶ 39} Duke Energy Ohio sought to recover supplement compensation (i.e., bonuses) paid to its salaried employees in addition to the overtime wages that the utility paid to its hourly employees. James E. Mehring, Duke Energy Business Services vice president of field operations for the Midwest region, testified that Duke Energy established the supplemental-compensation policy to recognize the contribution of salaried employees who had "endured extremely long, chaotic, and stressful days diligently working to restore service to Duke Energy Ohio's customers." He noted that some salaried employees had worked "in excess of 16 hours per day—for several consecutive days—dedicated to restoration activities."

{¶ 40} Although the commission recognized that Duke Energy Ohio was reasonable in paying overtime wages to hourly employees, it disallowed similar additional compensation for salaried employees, and thus it reduced the recovery by $3,279,446. In reaching this conclusion, the commission essentially established a per se rule that it is unreasonable to pay discretionary supplemental compensation to salaried employees working to restore power in emergency

conditions. The commission, however, points to no regulation or standard industry practice supporting such a rule. Rather, it apparently agreed with Anthony Yankel, an engineer who appeared in behalf of the Office of Consumers' Counsel, that it is not fair for ratepayers to shoulder these costs, because these employees were already "being paid a 'good salary' " and "were doing what they are being paid to do all along"—even though Yankel acknowledged that these employees worked extra hours in order to manage the emergency situation.

{¶ 41} It appears undisputed that Ohio ratepayers benefited from the extensive work performed by these employees, many of whom traveled from out of state to assist in the recovery efforts in Ohio. Notably, Yankel admitted that it was reasonable to pay *contractors* who contributed to the restoration efforts at overtime or double-time rates, but he failed to explain why it was unreasonable to compensate salaried employees in lieu of hiring third-party contractors to do the same work. Further, because Duke Energy Ohio paid supplemental compensation in the exercise of its business judgment, its use of salaried employees arguably saved ratepayers money. And the utility had an incentive to keep restoration costs down, because its managers understood that any expenses not recovered in rates would be borne by shareholders.

{¶ 42} Rather than adopt a per se rule in these kinds of circumstances, I would direct the commission to review all the evidence presented in order to determine whether paying supplemental compensation to salaried employees is reasonable and to decide whether the associated costs of labor loaders (i.e., benefits and payroll taxes) and supervision should be allowed.

### Contractor Labor Costs

{¶ 43} The commission also concluded that Duke Energy Ohio cannot recover approximately $10 million of its costs for third-party contractors who aided in the restoration effort. Although it recognized that the utility was reasonable in hiring contractors to help restore power to customers and therefore

could recover reasonable contractor costs, the commission determined that Duke Energy Ohio had failed to substantiate its actual costs.

{¶ 44} First, the commission reduced Duke Energy Ohio's recovery by $2,748,442, based on a finding that on a spreadsheet prepared by the utility listing contractor costs, some of the entries refer to a Duke Energy affiliate as the responsible party. In his testimony, Yankel pointed out that some entries documenting Duke Energy Ohio's contractor costs listed the "PayCo" as a corporate affiliate, Duke Energy Indiana or Duke Energy Kentucky. Based on this fact, Yankel surmised that these entries referred to work performed in Indiana or Kentucky on behalf of a Duke Energy affiliate and he recommended disallowing these contractor costs; the commission agreed and disallowed almost $3 million of these costs.

{¶ 45} The problem with this reasoning, however, is that the PayCo designation resulted from a programming error and therefore does not indicate that an entity other than Duke Energy Ohio was responsible for the contractor costs. As Beth Clippinger, director of financial planning and analysis for Duke Energy Business Services, explained, "PayCo does not relate to an external vendor. * * * PayCo only relates to internal labor. PayCo has nothing to do with anything besides internal labor." According to Clippinger, "when the [spreadsheet] was constructed, PayCo was inadvertently left in for things that related to items besides internal labor, it has no meaning except for internal labor. It's just something that the system automatically spits out." Thus, the PayCo designation is irrelevant for determining which affiliate paid the contractor, and the commission's decision to reduce the recovery of contractor costs based solely on the PayCo designation is not supported by the evidence.

{¶ 46} Second, relying on Yankel's testimony, the commission reduced the amount of recovery by an additional $6,970,112, citing "discrepancies in the documentation for contractor expenses which should have been billed to affiliates

in other states and not billed to Duke-Ohio." It noted that the work-location information had been "whited out" or omitted from documents supporting contractor invoices.

{¶ 47} However, according to the record, the invoices *do* indicate that Duke Energy Ohio incurred these contractor costs for restoration work in Ohio, because the contractors included a state-specific "storm code" on them. James Mehring testified that Duke Energy provided storm codes to its employees and contractors to designate for billing purposes the state in which work was performed (i.e., Ohio, Indiana, or Kentucky). Thus, following this procedure, contractors billed Duke Energy for work performed on its behalf in this state by using the Ohio-specific storm code, and Mehring testified that he had "no reason to believe that that process was not followed." And there is no indication that the utility did not actually pay these expenses nor any allegation that Duke Energy Ohio or its contractors committed fraud in submitting the invoices.

{¶ 48} Yankel disputed whether certain invoices were for work done in Ohio despite acknowledging that the storm code listed on them designated Ohio. For instance, he asserted that the fact that certain invoices were submitted for payment to an address in Erlanger, Kentucky, suggests that contractors had not worked in Ohio, because "[g]iven the fact that most of the corporate structure for the Ohio, Indiana, and Kentucky region are headquartered in Ohio, and the fact that this work was supposed to have taken place in Ohio, one would have expected that the invoice would have been sent to Ohio." He also noted that some invoices were supported by receipts for food, laundry, and other services purchased in Kentucky. Based on these facts, Yankel *speculated* that the workers who had submitted those receipts had not been performing work in Ohio.

{¶ 49} However, Duke Energy Ohio explained that Erlanger, which is just across the Ohio River from Cincinnati, served as the staging ground for the power-restoration effort in Ohio. Thus, the fact that a contractor submitted

invoices to an Erlanger, Kentucky address or incurred costs in Kentucky does not prove that the contractor did not work in Ohio, especially when the contractor used the Ohio storm code and Duke Energy Ohio paid those invoices.

{¶ 50} Notwithstanding the fact that Ohio storm codes were on the invoices, Yankel recommended reducing Duke Energy Ohio's recovery. He noted that he had considered recommending a 90 percent reduction based on his analysis of invoices submitted *by a single contractor*, but he "thought 90 percent may have been pushing the envelope a little bit." He also asserted that he could have recommended reducing Duke Energy Ohio's recovery by 75 percent or by 50 percent. However, Yankel decided to recommend reducing the recovery by two-thirds, based on the fact that there were three affiliates from three states— Ohio, Indiana, and Kentucky—involved in the restoration efforts. The commission agreed, stating that "there is sufficient evidence to suggest that, at most, Duke-Ohio may reasonably only recover one-third of this remainder; the other two-thirds should be allocated to the states of Indiana and Kentucky."

{¶ 51} This commission finding is speculative and arbitrary. Moreover, it bears no relation to the actual damage sustained by the electrical infrastructure in each of the three states or to the amounts each affiliate expended on contractors. Clippinger testified that Ohio had 61 percent of the sustained outages and 58 percent of the total costs of system recovery. In contrast, Indiana had 28 percent of the sustained outages and 33 percent of the total costs, leaving Kentucky with 11 percent of the outages and 9 percent of the cost. The commission therefore was unreasonable in determining that Duke Energy Ohio could recover only one-third of the contractor costs it submitted.

{¶ 52} For these reasons, the commission's decision reducing the recovery of contractor labor costs is not supported by the record.

**Conclusion**

**{¶ 53}** It is not the court's role to determine the precise amount that Duke Energy Ohio should be allowed to recover from ratepayers. That responsibility belongs to the Public Utilities Commission in the first instance. Here, however, it appears that the commission reduced Duke Energy Ohio's recovery based largely, if not solely, on an expert witness's review of some of the evidence presented, rather than on its own independent examination of the whole record. And because that witness's opinion is based on speculation and is unreliable, the fact that the commission relied so heavily on it casts doubt on the entirety of the commission's decision. Accordingly, I would reverse the decision of the commission and remand the matter for additional consideration.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

_____

Amy B. Spiller and Elizabeth H. Watts, for appellant.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Stephen A. Reilly, Assistant Attorney General, for appellee.

_____