O’Donnell, J.,
dissenting.
{¶ 35} Respectfully, I dissent.
{¶ 36} This case concerns whether Duke Energy Ohio, Inc., reasonably and prudently incurred over $30 million in storm restoration costs when it responded to the unprecedented damage caused by Hurricane Ike on this state. The Public Utilities Commission determined that the utility had failed to substantiate the reasonableness of its expenditures and therefore reduced recovery by more than $14 minion. Among other charges that the commission determined that Duke Energy Ohio could not recover, the commission concluded that the utility could not charge ratepayers for the $3.2 million in supplemental compensation that it paid to salaried employees who worked overtime in the power-restoration effort *494 and that it could not recover almost $10 million of the contractor costs it incurred, based on the conclusion that the contractors’ invoices failed to prove that contractors actually performed work in Ohio.
{¶ 37} In my view, the commission reached its decision by unreasonably relying mainly on the testimony of a single expert witness who formulated opinions based on speculation and generalization about all the evidence from an incomplete review of the actual evidence in the case. Accordingly, I would reverse the commission’s decision and remand the matter for further proceedings.
Standard of Review
{¶ 38} Our standard of review is set forth in R.C. 4903.13, which provides that “[a] final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable.” As we explained in Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm., 129 Ohio St.3d 485, 2011-Ohio-4189, 954 N.E.2d 104,
[w]e will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission’s decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty.
Id. at ¶ 20.
Supplemental Compensation
{¶ 39} Duke Energy Ohio sought to recover supplement compensation (i.e., bonuses) paid to its salaried employees in addition to the overtime wages that the utility paid to its hourly employees. James E. Mehring, Duke Energy Business Services vice president of field operations for the Midwest region, testified that Duke Energy established the supplemental-compensation policy to recognize the contribution of salaried employees who had “endured extremely long, chaotic, and stressful days diligently working to restore service to Duke Energy Ohio’s customers.” He noted that some salaried employees had worked “in excess of 16 hours per day — for several consecutive days — dedicated to restoration activities.”
{¶ 40} Although the commission recognized that Duke Energy Ohio was reasonable in paying overtime wages to hourly employees, it disallowed similar additional compensation for salaried employees, and thus it reduced the recovery by $3,279,446. In reaching this conclusion, the commission essentially established a per se rule that it is unreasonable to pay discretionary supplemental compensation to salaried employees working to restore power in emergency conditions. *495 The commission, however, points to no regulation or standard industry practice supporting such a rule. Rather, it apparently agreed with Anthony Yankel, an engineer who appeared in behalf of the Office of Consumers’ Counsel, that it is not fair for ratepayers to shoulder these costs, because these employees were already “being paid a ‘good salary’ ” and “were doing what they are being paid to do all along” — even though Yankel acknowledged that these employees worked extra hours in order to manage the emergency situation.
{¶ 41} It appears undisputed that Ohio ratepayers benefited from the extensive work performed by these employees, many of whom traveled from out of state to assist in the recovery efforts in Ohio. Notably, Yankel admitted that it was reasonable to pay contractors who contributed to the restoration efforts at overtime or double-time rates, but he failed to explain why it was unreasonable to compensate salaried employees in lieu of hiring third-party contractors to do the same work. Further, because Duke Energy Ohio paid supplemental compensation in the exercise of its business judgment, its use of salaried employees arguably saved ratepayers money. And the utility had an incentive to keep restoration costs down, because its managers understood that any expenses not recovered in rates would be borne by shareholders.
{¶ 42} Rather than adopt a per se rule in these kinds of circumstances, I would direct the commission to review all the evidence presented in order to determine whether paying supplemental compensation to salaried employees is reasonable and to decide whether the associated costs of labor loaders (i.e., benefits and payroll taxes) and supervision should be allowed.
Contractor Labor Costs
{¶ 43} The commission also concluded that Duke Energy Ohio cannot recover approximately $10 million of its costs for third-party contractors who aided in the restoration effort. Although it recognized that the utility was reasonable in hiring contractors to help restore power to customers and therefore could recover reasonable contractor costs, the commission determined that Duke Energy Ohio had failed to substantiate its actual costs.
{¶ 44} First, the commission reduced Duke Energy Ohio’s recovery by $2,748,442, based on a finding that on a spreadsheet prepared by the utility listing contractor costs, some of the entries refer to a Duke Energy affiliate as the responsible party. In his testimony, Yankel pointed out that some entries documenting Duke Energy Ohio’s contractor costs listed the “PayCo” as a corporate affiliate, Duke Energy Indiana or Duke Energy Kentucky. Based on this fact, Yankel surmised that these entries referred to work performed in Indiana or Kentucky on behalf of a Duke Energy affiliate and he recommended disallowing these contractor costs; the commission agreed and disallowed almost $3 million of these costs.
*496 {¶ 45} The problem with this reasoning, however, is that the PayCo designation resulted from a programming error and therefore does not indicate that an entity other than Duke Energy Ohio was responsible for the contractor costs. As Beth Clippinger, director of financial planning and analysis for Duke Energy Business Services, explained, “PayCo does not relate to an external vendor. * * * PayCo only relates to internal labor. PayCo has nothing to do with anything besides internal labor.” According to Clippinger, “when the [spreadsheet] was constructed, PayCo was inadvertently left in for things that related to items besides internal labor, it has no meaning except for internal labor. It’s just something that the system automatically spits out.” Thus, the PayCo designation is irrelevant for determining which affiliate paid the contractor, and the commission’s decision to reduce the recovery of contractor costs based solely on the PayCo designation is not supported by the evidence.
{¶46} Second, relying on Yankel’s testimony, the commission reduced the amount of recovery by an additional $6,970,112, citing “discrepancies in the documentation for contractor expenses which should have been billed to affiliates in other states and not billed to Duke-Ohio.” It noted that the work-location information had been “whited out” or omitted from documents supporting contractor invoices.
{¶ 47} However, according -to the record, the invoices do indicate that Duke Energy Ohio incurred these contractor costs for restoration work in Ohio, because the contractors included a state-specific “storm code” on them. James Mehring testified that Duke Energy provided storm codes to its employees and contractors to designate for billing purposes the state in which work was performed (i.e., Ohio, Indiana, or Kentucky). Thus, following this procedure, contractors billed Duke Energy for work performed on its behalf in this state by using the Ohio-specific storm code, and Mehring testified that he had “no reason to believe that that process was not followed.” And there is no indication that the utility did not actually pay these expenses nor any allegation that Duke Energy Ohio or its contractors committed fraud in submitting the invoices.
{¶ 48} Yankel disputed whether certain invoices were for work done in Ohio despite acknowledging that the storm code listed on them designated Ohio. For instance, he asserted that the fact that certain invoices were submitted for payment to an address in Erlanger, Kentucky, suggests that contractors had not worked in Ohio, because “[g]iven the fact that most of the corporate structure for the Ohio, Indiana, and Kentucky region are headquartered in Ohio, and the fact that this work was supposed to have taken place in Ohio, one would have expected that the invoice would have been sent to Ohio.” He also noted that ■some invoices were supported by receipts for food, laundry, and other services *497 purchased in Kentucky. Based on these facts, Yankel speculated that the workers who had submitted those receipts had not been performing work in Ohio.
{¶ 49} However, Duke Energy Ohio explained that Erlanger, which is just across the Ohio River from Cincinnati, served as the staging ground for the power-restoration effort in Ohio. Thus, the fact that a contractor submitted invoices to an Erlanger, Kentucky address or incurred costs in Kentucky does not prove that the contractor did not work in Ohio, especially when the contractor used the Ohio storm code and Duke Energy Ohio paid those invoices.
{¶ 50} Notwithstanding the fact that Ohio storm codes were on the invoices, Yankel recommended reducing Duke Energy Ohio’s recovery. He noted that he had considered recommending a 90 percent reduction based on his analysis of invoices submitted by a single contractor, but he “thought 90 percent may have been pushing the envelope a little bit.” He also asserted that he could have recommended reducing Duke Energy Ohio’s recovery by 75 percent or by 50 percent. However, Yankel decided to recommend reducing the recovery by two-thirds, based on the fact that there were three affiliates from three states — Ohio, Indiana, and Kentucky — involved in the restoration efforts. The commission agreed, stating that “there is sufficient evidence to suggest that, at most, Duke-Ohio may reasonably only recover one-third of this remainder; the other two-thirds should be allocated to the states of Indiana and Kentucky.”
{¶ 51} This commission finding is speculative and arbitrary. Moreover, it' bears no relation to the- actual damage sustained by the electrical infrastructure in each of the three states or to the amounts each affiliate expended on contractors. Clippinger testified that Ohio had 61 percent of the sustained outages and 58 percent of the total costs of system recovery. In contrast, Indiana had 28 percent of the sustained outages and 33 percent of the total costs, leaving Kentucky with 11 percent of the outages and 9 percent of the cost. The commission therefore was unreasonable in determining that Duke Energy Ohio could recover only one-third of the contractor costs it submitted.
{¶ 52} For these reasons, the commission’s decision reducing the recovery of contractor labor costs is not supported by the record.
Conclusion
{¶ 53} It is not the court’s role to determine the precise amount that Duke Energy Ohio should be allowed to recover from ratepayers. That responsibility belongs to the Public Utilities Commission in the first instance. Here, however, it appears that the commission reduced Duke Energy Ohio’s recovery based largely, if not solely, on an expert witness’s review of some of the evidence presented, rather than on its own independent examination of the whole record. And because that witness’s opinion is based on speculation and is unreliable, the *498 fact that the commission relied so heavily on it casts doubt on the entirety of the commission’s decision. Accordingly, I would reverse the decision of the commission and remand the matter for additional consideration.
Amy B. Spiller and Elizabeth H. Watts, for appellant.
Michael DeWine, Attorney General, William L. Wright, Section Chief, and Stephen A. Reilly, Assistant Attorney General, for appellee.
Lundberg Stratton, J., concurs in the foregoing dissenting opinion.