NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0928n.06

Nos. 12-4457; 12-4466; 12-4517; 13-3021

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

RONALD E. STEWART,        12-4457
CATHERINE L. STEWART,

CHARLES CAIN, et al.,        13-3021

        Plaintiffs - Appellants,

    v.

CHESAPEAKE EXPLORATION, L.L.C.,

        Defendant - Appellee,
_____

CHESAPEAKE EXPLORATION, L.L.C.,
CHK UTICA, L.L.C.,

        Plaintiffs - Appellees,

    v.

CATLETT QUALITY PLUMBING &        12-4466
HEATING, INC., et al.,

ERIC L. HARTONG, et al.,        12-4517

        Defendants - Appellants,

**FILED**
Oct 30, 2013
DEBORAH S. HUNT, Clerk

On Appeal from the United States
District Court for the Northern
District of Ohio

Before:  MOORE, KETHLEDGE, and STRANCH, Circuit Judges.

KETHLEDGE, Circuit Judge.  This case concerns the interpretation of oil and gas leases between numerous landowners in Ohio, on the one hand, and Chesapeake Exploration, L.L.C., on the other.  Each lease grants Chesapeake, the lessee, the right to match any third-party offer to lease

the land for purposes of oil and gas exploration. The landowners argue that, if Chesapeake declines to match such a third-party offer, the landowners can terminate Chesapeake's lease in order to enter a new lease with the third-party—effective immediately. The district court rejected that argument. We affirm.

I.

The landowners each own property in eastern Ohio. Between 2008 and 2010, they each leased their oil and gas rights to Anschutz Exploration, which later assigned its interests to Chesapeake. The relevant lease terms are the same for all the landowners here.

Each lease grants Chesapeake the exclusive right to search for, produce, and sell oil and gas found beneath the property. The lease is effective for a "primary term" of three to five years. The lease remains effective after the primary term as long as Chesapeake conducts operations, has a well capable of production, or makes prescribed payments. The landowners receive rent—paid up front for the primary term—until a well is in place. Then they receive royalties.

At issue here is Paragraph 14 of the lease, which grants Chesapeake the right to match a third-party offer to lease the land. The landowners have received such third-party offers and Chesapeake has refused to match them.

Chesapeake and the landowners filed separate lawsuits in the district court. Chesapeake sought a declaration that the landowners could not terminate the existing lease if Chesapeake refused to match a third-party offer. The landowners sought declarations that they could terminate the lease if they accepted a third-party offer following Chesapeake's refusal. The district court adopted

Chesapeake's interpretation of the leases. The court therefore entered judgment in favor of Chesapeake in its action, and against the landowners in theirs. The landowners appealed.

II.

We review de novo the district court's interpretation of a lease. *See Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008). The parties agree that Ohio law applies here and that the lease's text, if not ambiguous, controls our interpretation of it. *See Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm'n*, 954 N.E.2d 104, 110 (Ohio 2011).

Paragraph 14 states:

> **14. PREFERENTIAL RIGHT TO RENEW.** If, at any time during the primary term hereof, or within one (1) year from the expiration, cancellation or termination of this Lease, Lessor receives an acceptable, bona fide third-party offer to lease the Leasehold, in whole or part, Lessor shall promptly provide the Lessee, in writing, of all the verifiable particulars of such third-party offer. Lessee shall have thirty (30) days from the receipt thereof to advise Lessor, in writing, of its agreement to match said third-party offer as to all terms and consideration; immediately thereafter, Lessor and Lessee shall take all cooperative steps necessary to effectuate the consummation of said transaction and the survival of said transaction through any statutorily mandated right of cancellation thereof. Any lease or option to lease the Leasehold, in whole or part, granted by Lessor in contravention of the purposes of this paragraph shall be deemed null and void.

The parties agree that Paragraph 14's first sentence ("If, at any time. . .") requires the landowners to notify Chesapeake of a third-party offer that arises during the primary term, and in the case of some of the leases, an offer that arises within a year of the lease's end. From there, the parties diverge.

The landowners read Paragraph 14 of the lease to impose upon Chesapeake a duty—rather than a "preferential right," which is what the Paragraph's title says—to match any third-party offer that a landowner receives during the term of Chesapeake's lease. Specifically, the landowners note that Paragraph 14 provides that Chesapeake "shall have thirty (30) days from the receipt thereof to advise Lessor, in writing, of its agreement to match said third-party offer"; and the landowners contend that the word "shall" obligates Chesapeake to match any offer that comes in. The landowners further assert that any failure by Chesapeake to match a third-party offer amounts to a breach of the lease, allowing the landowner immediately to terminate it.

We disagree with the landowners' reading of this language. Paragraph 14 does not say that Chesapeake "shall match" any third-party offer; what it says, rather, is that Chesapeake "*shall have thirty (30) days*" to advise a landowner of Chesapeake's decision to accept such an offer. What the cited language mandates, then, is that Chesapeake have 30 days to make its decision, not what the decision is. This point is confirmed by the Paragraph's title, which again purports to grant Chesapeake a "right" rather than impose on it an obligation. The point is also confirmed by the Paragraph's temporal scope, which extends to "one (1) year from the expiration, cancellation or termination of this Lease[.]" Thus, under the landowners' reading of the provision, Chesapeake would breach the lease if Chesapeake declined to match a third-party offer made 11 months after the lease had already expired by its terms. That reading is strange at best; whereas it would not be strange for a lessee to have a right to renew a lease—on the same terms offered by a third party—within a year of the lease's expiration.

But the landowners argue that other language in Paragraph 14 supports their reading. Specifically, Paragraph 14 states that, if Chesapeake advises a landowner of Chesapeake's decision "to match said third-party offer[,]" then "immediately thereafter, Lessor and Lessee shall take all cooperative steps necessary to effectuate the consummation of said transaction[.]"  The landowners then read "said transaction" to refer back to the third-party offer, which in turn means that, if Chesapeake declines to accept such an offer, Chesapeake must allow the landowner to "consummate" that "transaction" with the third party.  But there are at least two problems with this argument.  First, an offer is not a "transaction," and thus "said transaction," as used in Paragraph 14, refers to Chesapeake's agreement to match a third-party offer, not the offer itself.  Second, the word "consummate" does not mean to commence performance of a contract according to its terms. Rather, to consummate a contract is to "complet[e] . . . a contract by *mutual signature*."  Webster's Third New International Dictionary 490 (2002) (emphasis added).  Thus, if Chesapeake chooses to exercise its right to match a third-party offer, Paragraph 14 requires Chesapeake promptly to sign an agreement to that effect with the landowner.  The Paragraph does not require such an agreement actually to take effect before the end of Chesapeake's existing lease—much less require Chesapeake to terminate its lease.

The landowners' interpretation of Paragraph 14 also conflicts with several other provisions in the lease.  For example, Paragraph 3 states that "[t]his Lease *shall remain in force* for a primary term of three (3) years" (emphasis added); but under the landowners' reading the lease would terminate before then if Chesapeake declined to match a third-party offer during that term. Similarly, Paragraph 4 states that Chesapeake "has the option to extend the primary term of this

Lease for one additional term of three (3) years from the expiration of the primary term of this Lease[,]" and that "[e]xercise of this option is at [Chesapeake]'s sole discretion[.]" Under the landowners' reading, however, Chesapeake would have no discretion and no option to extend the lease if it failed to match a third-party offer during the lease's primary term. Paragraph 12 likewise states that "this lease *shall remain in force* and its lease terms shall continue so long as" Chesapeake is actively engaged in drilling operations on the subject property; but under the landowners' reading a landowner could order Chesapeake to remove its equipment immediately if Chesapeake declined to match a third party's offer.

The landowners respond that Paragraph 14 specifically addresses the parties' obligations once a third-party makes an offer to lease the property, and that Paragraph 14 therefore trumps all of these other provisions once such an offer is made. As explained above, however, the landowners' interpretation of Paragraph 14 is implausible. That their interpretation contradicts the plain terms of these other provisions only makes it more so.

Finally, the landowners argue that, under Chesapeake's interpretation of the lease agreement, the landowners could never eject Chesapeake from their property—even if Chesapeake made no effort to extract oil or gas from it, which undisputedly is the object of the agreement—so long as Chesapeake makes the minimal "delay" payments prescribed by Paragraph 5(A) of the lease. This concern appears more theoretical than real, at least on this record, since there is no evidence that Chesapeake has actually thwarted a lease agreement's purpose in this manner. Moreover, Ohio law recognizes an implied obligation to perform a contract in good faith. *See Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1082 (Ohio 1996). Here, as Chesapeake itself emphasizes,

the interests of both parties are served by Chesapeake's exploration and drilling upon the property as soon as practicable. We are therefore confident that, if Chesapeake declined in bad faith to explore or drill on a landowner's property, and instead sought merely to hold the property indefinitely, Ohio law would provide the landowner a remedy.

In summary, we agree with the district court that, by its terms, Paragraph 14 does not grant the landowners a right to terminate their leases, but instead grants Chesapeake a "preferential right to renew" them. And because the district court correctly interpreted the lease as a matter of law, it did not—as the landowners separately argue here—abuse its discretion when it stayed discovery (with respect to parol evidence) pending its interpretation of the lease on summary judgment. *See Hahn v. Star Bank*, 190 F.3d 708, 719 (6th Cir. 1999).

The district court's judgments are affirmed.