HELENE N. WHITE, Circuit Judge,
dissenting.
I respectfully dissent from the maj only’s conclusion that Masco’s tort claims against the Cefla companies (Cefla) are barred by printed terms attached to the Sales Agreement between Masco and Stiles.[1] The record clearly establishes that those printed terms are not part of Masco’s contract with Stiles and that Mas-co had no contract with Cefla. Further, if the handwritten term adopting Masco’s *202 terms and conditions is not recognized as superseding the printed terms and conditions on which Cefla relies, there is clearly at least a question of fact whether Masco agreed with either Stiles or Cefla that Cefla’s printed terms would apply, thus precluding summary judgment. I would reverse and remand.
Masco’s parent company, Masco Corporation, entered into a National Purchasing Agreement (NPA) with Stiles in 2001, setting forth standard terms and conditions for all orders submitted to Stiles by Mas-co Corporation and its subsidiaries, including Masco. Masco and Stiles renewed the NPA for calendar year 2004, during which the sale at issue took place. On January 26, 2004, Cefla sent Masco a proposal for the sale of the UV3 roll-coat system. In the twenty-one page proposal, Cefla detailed the equipment’s custom specifications and offered to sell the UV3 equipment to Masco for $2,832,819. Bob Langridge, a Stiles employee, is identified as the sales .representative on the first page of the proposal. The last page of the proposal states that the equipment is “offered subject to [Cefla’s] General Conditions of Sale.” R. 37-5, Proposal, PID 485. The day after Cefla sent the proposal, Langridge prepared a separate document on Stiles letterhead for the sale of the equipment to Masco by Stiles. This Sales Agreement describes the equipment, offers a discounted price of $2,600,000, shipping terms, and, although Stiles’s “Standard Terms and Conditions of Sale” are printed on the reverse side of the Sales Agreement and a second sheet containing Cefla’s “Standard Terms and Conditions of Sale” is also attached, the front page of the agreement states in handwriting: “Masco terms and conditions apply according to current National Purchasing Agreement with Stiles Machinery.” R. 37-5, Sales Agreement, PID 462. Masco’s Vice President of Manufacturing Operations Don Cox signed the Sales Agreement on January 27, 2014. Three days later, Stiles sent Masco an invoice for $2,600,000. Consistent with the NPA, the invoice identifies the Sales Agreement as an order from Masco to Stiles.
The majority views Cefla’s proposal as an offer and the Sales Agreement as an acceptance. Maj. Op. at 197-98. I find no basis for this construct.[2] First, Masco made no promise to Cefla. See Williams v. Ormsby, 131 Ohio St.3d 427, 966 N.E.2d 255, 258 (2012) (defining a contract as a promise or set of promises actionable upon breach).[3] Rather, Masco accepted the *203 Sales Agreement proffered' by Stiles, which contained different terms, including a discounted price and the adoption of the terms and conditions of the NPA. Under this agreement, Masco promised to pay Stiles for the UV3 equipment, and Stiles promised to provide it at the agreed price according to the terms and conditions of the NPA and the specifications referenced in the proposal. Masco made no promises to Cefla and there was no “manifestation of mutual assent”'to Cefla’s printed language. Lake Land Emp’t Grp. of Akron, LLC v. Columber, 101 Ohio St.3d 242, 804 N.E.2d 27, 31 (2004). Even if the Masco-Stiles Sales Agreement is reimagined as a legal act in relation to Cefla rather than Stiles, Masco’s signing the Sales Agreement can only be viewed as a counteroffer proposing altered terms, including a discounted price and the handwritten provision that the NPA’s terms apply. There is simply no basis to conclude that the Sales Agreement constitutes Masco’s acceptance of Cefla’s proposal with its standard terms and conditions.
Without doubt, Cefla was intimately involved in the transaction through its dé-sign and manufacture of the UV3 line for Masco. But it does not follow that Cefla is a party to the Sales Agreement or that its printed terms are part of that contract. In 2002, Stiles sent a letter to Cefla explaining that Stiles had “come across certain customers that are not as familiar with [Cefla] as they are with Stiles and ... are not comfortable entering into any agreement with [Cefla].” R. 37-6, Callahan Letter, PID 492. In order to “keep the transaction alive,” Stiles would “present the customer with a Stiles Sales Agreement which the customer is willing to sign and then Stiles [would] submit[] the signed Sales Agreement to [Cefla] for fulfillment.” Id. The letter makes clear that Stiles proposed to contract directly with end customers and shoulder the responsibility for procuring fulfillment by the Cefla companies. In line with this understanding of Stiles’s role, Masco and Stiles entered into a contract obligating Stiles to sell, and Masco to buy, a Cefla designed and manufactured UV3 line using the NPA negotiated between Stiles and Masco.
The majority is persuaded that Cefla is in privity with Masco in part because the Cefla equipment is described in the Stiles Sales Agreement by reference to Cefla’s proposal. Maj. Op. at 199. Under the heading “Machinery Description,” the Sales Agreement states, “Cefla Group Roll Coat System (UV3) (Reference Cefla Drawing No. CE.04-0133-14) as per proposal # CE-3227C dated January 26th, 2004.” R. 37-5, Sales Agreement, PID 462. Masco asserts, consistent with the NPA, that this language is only a reference to the equipment’s technical specifications, not an acceptance of Cefla’s proposal. The majority rejects this argument as “not plausible.” Maj. Op. at 199. I disagree. Not only is the argument plausible, it is persuasively supported by the terms of the NPA expressly incorporated into the Sales Agreement. The NPA provides:
This purchase order is Buyer’s offer limited to the specific terms and conditions of this offer and does not constitute an acceptance by Buyer of any offer to sell or quotation of Seller. Any reference to Seller’s offer to sell or quotation is solely for the purpose of incorporating the description and specifications of the goods and services covered hereby to the ex *204 tent that such description and specifications do not conflict with the description and specifications on the face of this purchase order.
R. 35-2, NPA, PID 321. Masco’s position is consistent with the bargained-for terms that exclusively govern its long-term purchasing arrangement with Stiles.
Lastly, the majority concludes that Cefla is a party to the Sales Agreement because Stiles was acting as its agent. But concepts of agency and privity are simply red herrings; whoever the parties to the Sales Agreement may be, the contract terms control. Here, even accepting the fiction that Cefla is somehow a party to the Sales Agreement between Stiles and Masco, that contract does not include the printed terms on which Cefla relies because the NPA supersedes the printed form. The majority’s conclusion that the Cefla terms attached to the Stiles Sales Agreement are part of the contract between Masco and Stiles and further evidence that Cefla is party to the contract is unfounded. See Maj. Op. at 196, 199. Basic contract law instructs that the NPA terms control. Taking the Sales Agreement as including the front page with the specifics of the agreement and handwritten entries, together with Stiles’s printed terms and conditions on the reverse side and the attached printed sheet containing Cefla’s terms and conditions, the Sales Agreement purports to incorporate three sets of terms and conditions. First, there is a handwritten note that provides, “Masco terms and conditions apply according to current national purchasing agreement with Stiles Machinery.” R. 37-5, Sales Agreement, PID 462. Second, there is a printed statement that provides, “Your order is subject to the terms and conditions on the reverse side” — namely, the Stiles terms. Id. And third, there is Cefla’s printed terms.[4] The two relevant sets of terms — the NPA terms and the Cefla terms[5] — conflict. Each set of terms purports to exclude the other terms in their entirety. The NPA provides, “Seller’s standard terms and conditions of sale, whether communicated in writing, electronically, or by any other media, shall have no force or effect,” and “[a]ny terms or conditions proposed in Seller’s acceptance of this offer which add to, vary from or conflict with any of the terms or conditions of this purchase order are deemed to be material and are hereby objected to and rejected.” R. 35-2, NPA, PID 319, 321. On the other hand, Cefla’s standard terms and conditions provide that Masco’s “acceptance of any part of the goods sold hereunder, any payment by Buyer for such goods, or any other form of acceptance by Buyer, shall constitute Buyer’s acceptance of all terms and conditions herein,” and Cefla “objects to any terms and conditions proposed by Buyer which vary the terms hereof.” R. 37-5, Sales Agreement, PID 464. Thus, there is a conflict on the face of the S.ales Agreement between the handwritten provision that Masco’s terms apply and the printed language that Cefla’s terms apply.
Applying Ohio rules of contract construction, which reflect the most basic contract principles, the Masco terms prevail over the Cefla terms. “When there is a conflict between any of the preprinted provisions of a contract and those inserted in handwriting at the time the contract is executed, the handwritten terms will com- *205 trol.” 18 Ohio Jur.3d Contracts § 135; see also Farmers’ Nat’l Bank v. Del. Ins, Co., 83 Ohio St. 309, 94 N.E. 834, 834 (1911) (“Where there is a conflict between any of the printed provisions of a contract and those inserted in writing at the time the contract is executed, the latter will control.”); Love v. Beck Energy Corp., No. 14 NO 415, 2015 WL 1453338, at *3 (Ohio Ct.App. Mar. 31, 2015) (“In looking at the four corners of a contract there is a rule of construction that provides handwritten prevails over typed or preprinted terms when there is a conflict between the two”). Here, the terms and conditions of the Mas-co-Stiles NPA were expressly incorporated in handwriting, thus negating Cefla’s conflicting preprinted terms.
Further, “[w]hen confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement.” Westfield Ins. Co. v. Galatis, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261 (2003); see also Skinner v. Guar. Trust Life Ins. Co., 813 F.Supp.2d 865, 869 (S.D.Ohio 2011). “The court examines the contract as a whole and presumes that the intent of the parties is reflected in the language used in the agreement.” Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Utils. Comm’n, 129 Ohio St.3d 485, 954 N.E.2d 104, 110 (2011). Here, the handwritten provision and the entire course of dealing between Masco and Stiles make clear that- the contracting parties intended to supersede the printed terms with the terms of the NPA, and the NPA makes clear that Masco’s purchasing relationship with Stiles is premised on the bargained-for, exclusive terms of that agreement.[6]
The district court determined Masco’s claims would be barred under either the Cefla terms or the NPA terms, R. 44, Opinion and Order, PID 763-64, and the majority accepts this analysis, Maj. Op. at 196-97. It is indeed true that the liability-limiting language of both documents would bar this tort action if either applies to Cefla. However, for the reasons discussed, regardless what the Cefla terms say, they are not part of the contract. And, the NPA does not assist Cefla because there is no provision in the NPA limiting Cefla’s liability. The NPA’s limitation-of-liability provision by its terms applies only to Stiles.[7] Cefla could have required that Stiles procure Masco’s agreement to the Cefla terms it now seeks to enforce, but it did not. Or, Cefla could have insisted that the NPA’s limitation of Stiles’s liability also apply to Cefla, but it failed to do this as well. Thus, even if Cefla is deemed a party to the Sales Agreement, or if Stiles is seen as Cefla’s *206 agent, the contract simply does not bar Masco’s tort claims against Cefla.
I would reverse the grant of summary judgment to Cefla and remand for further proceedings.[8]

. The companies’ current names are used for clarity. The parties do not dispute that Cefla and Masco are the respective successors of Cefla Finishing America, Inc. and KraftMaid Cabinetry, Inc., the relevant corporate entities in 2004.

. Contrary to the majority's assertion, Masco does not concede "that a contract was formed when Masco, by executing the Sales Agreement on January 27, 2004, accepted Cefla NA’s offer, as set forth in its Proposal,” or . that "the essential elements the parties mutually assented to are set forth in great detail in the proposal.” Maj, Op. at 197. Masco argues that "[t]he only agreement for the purchase of the UV3 production line was the Masco-Stiles Sales Agreement, which was indisputably a contract solely between Masco and Stiles Machinery.” Masco Br. at 11.

. Federal courts sitting in diversity apply the law of the forum state to determine whether there is a valid choice-of-law provision. See Performance Contracting Inc. v. DynaSteel Corp., 750 F,3d 608, 616 (6th Cir.2014) (upholding a choice-of-law provision under the law of the forum); Langley v. Prudential Mortg. Capital Co., LLC, 546 F.3d 365, 368 (6th Cir.2008) (holding that the law of the forum applies to the determination whether there is a valid contract with a forum-selection clause); Wallace Hardware Co., Inc. v. Abrams, 223 F.3d 382, 391 (6th Cir.2000) (applying the law of the forum to determine whether a choice-of-law provision governs). If there is no contract, there can be no contractual choice of law. The majority puts the cart before the horse by first deciding that Michigan law governs under a contractual choice-of-law provision, then applying Michigan law to determine whether there is a contract. See Maj. Op. at 196-97. Cefla does *203 not contest that Ohio law governs this initial question of contract formation. See Cefla Br, at 11 ("Ohio law governs the interpretation of the Parties’ contract because this case was filed in federal court in Ohio.”). In any event, the choice of law is not determinative in this case.

. Although “reverse side” implies only one page of terms, the parties appear to agree that the printed statement refers to both of the additional pages. See, e.g., R. 37-5, Anderson Dep., PID 447 (describing the Sales Agreement as a three-page document including both the Stiles terms and the Cefla terms).

. Tellingly, no one argues that Stiles’s printed terms and conditions apply.

. Applying Michigan law would yield the same result. See, e.g., 5A Mich. Civ. Jur. Contracts § 149 (“The intention of the parties, as expressed in their contracts, is to govern in the construction of the contracts.”); id. § 163 (“The written portion of a contract, if inconsistent with any part of the printed form, must govern and control.”).

. The NPA has an attached Warranty Statement that refers to Stiles’s warranties, obligations, and liability. It limits Stiles’s warranty to claims of which it receives notice no later than one year following delivery and further provides:
IN NO EVENT SHALL STILES BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES, WAHTSOEVER, [sic] (INCLUDING, WITHOUT LIMITATION, PERSONAL INJURY, PROPERTY DAMAGE, LOST PROFITS OR OTHER ECONOMIC INJURY) EVEN IF STILES HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. STILES SHALL HAVE NO LIABILITY TO THE PRU-CHASER [sic] UNDER TORT THEORIES FOR ANY ALLEGED DESIGN DEFECT OR FOR ANY ALLEGED FAILURE TO WARN.
R. 35-2, NPA, PID 331 (emphasis added).

. To be clear, I would hold only that this tort . action against Cefla is not barred by the Cefla printed terms and conditions or the NPA, and do not express an opinion regarding any other legal impediments to Masco's recovering in tort against Cefla.